**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

FILED
JAMES J. WALDRON, CLERK

JUL 1 2 2005

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY _H. Quigley_ DEPUTY

|  |  |
|---|---|
| | Chapter 11 |
| **In Re:** | Case No.:    01-30135 (RG) |
| **G-I HOLDINGS, INC. f/k/a GAF CORPORATION, et al.** | Adv. No.:    04-2192  (RG) |
| **Debtors.** | |
| **OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS of G-I Holdings, Inc., suing on behalf of Chapter 11 estate of G-I Holdings, Inc. f/k/a GAF Corporation** | |
| **Plaintiff,** | |
| **vs.** | |
| **BUILDING MATERIALS CORPORATION OF AMERICA, et al.,** | |
| **Defendants.** | |

**OPINION**

**APPEARANCES:**

Dennis J. O'Grady, Esq.
Mark E. Hall, Esq.
Riker, Danzig, Scherer, Hyland & Perretti LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
*Co-Attorneys for the Debtors and*
*Building Materials Corporation of America*

Martin J. Bienenstock, Esq.
Philip Abelson, Esq.
Jennifer Feldsher, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York, 10153
***Co-Attorneys for the Debtors and***
***Building Materials Corporation of America***

Jeffrey D. Prol, Esq.
Scott Cargill, Esq.
Lowenstein Sandler, PC
65 Livingston Avenue
Roseland, New Jersey 07608
***Co-Counsel to Official Committee of Asbestos Claimants***

Trevor W. Swett, Esq.
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, D.C. 20005
***Co-Counsel to Official Committee of Asbestos Claimants***

Nancy A. Washington, Esq.
Saiber, Schlesinger, Satz & Goldstein, L.L.C.
One Gateway Center, 13th Floor
Newark, New Jersey 07102-5311
***Co-Counsel for the Legal Representative of Present and Future Holders of Asbestos-***
***Related Claims***

Brian P. Muething, Esq.
Keating Muething & Klekamp, PLL
One East Fourth Street
Cincinnati, OH 45202
***Co-Counsel for the Legal Representative of Present and Future Holders of Asbestos-***
***Related Claims***

Richard M. Meth, Esq.
Pitney Hardin LLP
P.O. Box 1945
Morristown, New Jersey 07962-1945
***Co-Counsel for Certain Noteholder Defendants***

Gregory W. Nye, Esq.
Donald J. Marchesseault, Esq.
Michael C. D'Agostino, Esq.
Bingham McCutchen LLP
One State Street
Hartford, Connecticut 06103
***Co-Counsel for Certain Noteholder Defendants***

Richard P. Norton, Esq.
Reed Smith LLP
One Riverfront Plaza, First Floor
Newark, New Jersey 07102
***Attorneys for Defendants Mellon Trust of New England, N.A.,
Standish Mellon Asset Management Company LLC, f/k/a Standish,
Ayer and Wood, Inc. and Pareto Partners***

Jennifer A. Fernicola, Esq.
Pitney Hardin LLP
P.O. Box 1945
Morristown, New Jersey 07962-1945
***Attorneys for Fifth Third Bank***

Robert K. Malone, Esq.
Drinker Biddle & Reath LLP
500 Campus Drive
Florham Park, New Jersey 07932-1047
***Attorneys for Citibank, N.A., Citibank Private Banking Division and
Citigroup Global Markets, Inc.***

James J. Deluca, Esq.
Okin, Hollander & DeLuca, L.L.P.
Parker Plaza, 400 Kelby Street
Fort Lee, New Jersey 07024
***Co-Counsel to The Bank of New York, as Indenture Trustee***

Leo T. Crowley, Esq.
Caryn Fitzgerald, Esq.
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, New York 10036
***Co-Counsel to The Bank of New York, as Indenture Trustee***

John B. Newman, Esq.
Newman & Simpson, LLP
32 Mercer Street
Hackensack, New Jersey 07601
***Attorneys for PNC Bank, N.A.***

Rosalia Niforatos , Esq.
KirkPatrick & Lockhart, Nicholson Graham LLP
One Newark Center, 10th Floor
Newark, NJ 07101
***Attorneys for HSBC USA Inc., Manufacturers & Traders Trust Co.
and Mizuho Trust and Banking Co. USA***

Michael F. Hahn, Esq.
Duane Morris, LLP
744 Broad Street
Suite 1200
Newark, NJ 07102
***Attorneys for The Bank of New York, in its capacity as Lender and Agent***

Frances S. Margolis, Esq.
Tompkins, McGuire & Wachenfeld
4 Gateway Center
100 Mulberry St.
Newark, NJ 07102
***Co-Counsel for Angelo Gordon & Co. L.P.***

Juan A. Skirrow, Esq.
Willkie Farr & Gallagher
787 Seventh Avenue
New York, NY 10019
***Co-Counsel for Angelo Gordon & Co. L.P.***

Eric E. Wohlforth, Esq.
Gibbons, DelDeo, Dolan, Griffinger et al
One Riverfront Plaza
Newark, NJ 07102-5497
***Attorneys for Dresdner Kleinwort Wasserstein Securities***

James M. Strauss, Esq.
Putney Twombly Hall & Hirson, LLP
120 Wood Avenue South
Iselin, NJ 08830
**Attorneys for St. Paul Guardian Insurance Company**

Jeffrey Bernstein, Esq.
McElroy Deutsch Mulvaney & Carpenter,LLP
Gateway 3
Newark, NJ 07102
**Attorneys for Morgan Keegan & Co.**

Hugh M. McDonald, Esq.
Allen & Overy, LLP
1221 Avenue of the Americas
New York, NY 10020
**Attorneys for Credit Suisse Asset Management**

Mary P. Miras, Esq.
Duval & Stachenfeld LLP
300 East 42nd Street, 3rd Floor
New York, NY 10580
**Attorneys for Swiss American Securities**

Barbara Maria Almeida, Esq.
O'Melveny & Myers
Times Square Tower
7 Times Square
New York, NY 10036
**Attorneys for Alliance Capital Management**

Brian H. Mukherjee, Esq.
Goodwin Procter LLP
Exchange Place, 53 State Street
Boston, MA 02109
**Attorneys for State Street Bank & Trust Company**

John A. Bougiamas, Esq.
Otterbourg, Steindler, Houston & Rosen, P.C.
230 Park Avenue
New York, NY 10169
***Attorneys for Wachovia Bank NA and Wachovia Securities***

Gus A. Paloian, Esq.
Seyfarth Shaw LLP
55 East Monroe St. Suite 4200
Chicago, IL 60603
***Attorneys for Northern Trust Co.***


## HONORABLE ROSEMARY GAMBARDELLA, CHIEF JUDGE

Presently before the Court is a motion filed by the Official Committee of Asbestos Claimants

(hereinafter the "Committee") for the entry of an order "directing that the $150 million of payments falling

due on July 15, 2005 to holders of notes issued by Building Materials Corporation of America (hereinafter

"BMCA") on July 17, 1998 be made in escrow pending further order of the Court."  The following

interested parties filed objections to the motion: G-I Holdings, Inc. (hereinafter "G-I Holdings"); BMCA;

"Certain Noteholder Defendants"[1]; Mellon Trust of New England, N.A.; Standing Mellon Asset

---

[1]The following Defendants will be collectively referred to as the "Certain Noteholder
Defendants": A.G. Edwards & Sons, Inc.; AIG Life Insurance Company; American General Life
Companies, LLC; AIG SunAmerica Asset Management Corp.; Amerus Capital Management
Group, Inc.; Banc of America Securities LLC; Bank of America, N.A.; Bank One Trust
Company, N.A.; Bear Stearns Corporate Lending, Inc., As Lender; Bear Stearns Asset
Management; Bear Stearns Securities Corp.; Caywood-Scholl Capital Management, LLC;
Charles Schwab & Co., Inc.; Comerica Bank; Delaware Investment Advisers, A Series of
Delaware Management Business Trust; Deutsche Bank Trust Company Americas; Fidelity
Investments Life Insurance Company; First Southwest Company; Forstmann Leff Associates
L.P.; The Guardian Life Insurance Company of America; ING Investment Management Co.;
ING Ghent Asset Management LLC; Equitable Life Insurance Company of Iowa; JPMorgan
Chase Bank, N.A.; Liberty National Life Insurance Company; Thrivent Financial for Lutherans;
Mass Financial Services Company; Massachusetts Investors Trust; Massachusetts Mutual Life

Management Company LLC, f/k/a Standish, Ayer and Wood, Inc.; Pareto Partners; Fifth Third Bank;

Citibank, N.A.; Citibank Private Banking Division; Citigroup Global Markets, Inc.; The Bank of New

York in its capacity as indenture trustee for the 7 3/4% Senior Notes due 2005; and PNC Bank, N.A.

For the reasons that follow, the motion filed by the Committee seeking that the $150 million in payment be

made in escrow is hereby denied.          This Court conducted a hearing with respect to the motion on July

7, 2005, at which time the Court reserved decision. The following constitute the Court's findings of fact

and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052. See Fed. R. Bankr.

P. 7052 (West 2005). Pursuant to 28 U.S.C. § 157, this matter is a core proceeding. See generally 28

U.S.C. § 157(b) (West 2005). Further, the Court has jurisdiction over this matter pursuant to 28 U.S.C.

§ 1334 and the Standing Order of Reference from the United States District Court for the District of New

Jersey dated July 23, 1984. See 28 U.S.C. § 1334 (West 2005). Finally, venue is proper pursuant to 28

U.S.C. § 1409(a) (West 2005).

I.      **Factual Background and Procedural History**[2]

---

Insurance Company; Merrill Lynch Investment Managers, Limited Partnership; Merrill Lynch
Professional Clearing Corp.; Metropolitan Life Insurance Company; National Financial
Services LLC; Neuberger Berman LLC; OppenheimerFunds Distributor, Inc.; ORIX USA
Corporation; Pacific Investment Management Company LLC; Putnam Investment
Management, LLC; SunTrust Bank; The TCW Group, Inc.; UBS AG; UBS Financial Services;
UBS Securities AG; U.S. Bank National Association; and Wells Fargo Bank, National
Association.

[2]A significant portion of the "Factual Background and Procedural History" Section has been
excerpted from this Court's published Opinion dated June 8, 2004, captioned, G-I Holdings, Inc. v.
Those Parties Listed on Exhibit A, et al. (In re G-I Holdings, Inc.), 313 B.R. 612 (Bankr. D.N.J.
2004).

On January 5, 2001, G-I Holdings, which is a holding company, filed a voluntary petition under Chapter 11 of the Bankruptcy Code. On August 3, 2001, ACI, Inc., a subsidiary of G-I Holdings, filed a voluntary Chapter 11 petition. On October 10, 2001, this Court entered an Order directing the joint administration of the G-I Holdings and ACI, Inc. bankruptcy cases. Since the filing of its bankruptcy petition, G-I Holdings has been operating its business as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. See 11 U.S.C. § 1107(a)(West 2005); see also 11 U.S.C. § 1108 (West 2005). G-I Holdings is the successor-in-interest to GAF Corporation (hereinafter "GAF"), an entity named in approximately 500,000 asbestos actions prior to merging into G-I Holdings. The Committee submits that as successor-in-interest to GAF, G-I Holdings remains liable for approximately 150,000 asbestos lawsuits filed, but unresolved, as of the petition date and for unknown numbers of asbestos claims that will be filed in the future.

BMCA is an indirect subsidiary of G-I Holdings, and is also the primary operating subsidiary and principal asset of G-I Holdings. Significantly, BMCA is not a "debtor," as defined in § 101(13) of the Bankruptcy Code, in any bankruptcy proceeding. Established in 1994, BMCA received substantially all the assets of GAF's roofing products business and expressly assumed $204 million of asbestos liability, with G-I Holdings indemnifying BMCA against any additional asbestos liability. Notwithstanding that BMCA claims to have never manufactured any products containing asbestos, the Company has been named as an additional defendant in more than one thousand asbestos bodily injury lawsuits against GAF since September, 2000. Simply stated, the claims against BMCA are premised upon theories of successor liability or alter ego.

The Committee is an official committee of creditors appointed on January 22, 2001 by the United States Trustee pursuant to § 1102(a) of the Bankruptcy Code to represent those individuals who allegedly suffered injuries related to the inhalation of asbestos from products manufactured by the predecessors of G-I Holdings.  See 11 U.S.C. § 1102(a)(West 2005).  A Legal Representative, C. Judson Hamlin, has been appointed by the Court to represent persons who hold present and future asbestos related claims against G-I Holdings.  Finally, the Bank of New York (hereinafter "BNY") is both a participant and indenture trustee for a group of institutional lenders with revolving credit working capital agreements with BMCA.

On January 8, 2001, several days after filing for relief under Chapter 11 of the Bankruptcy Code, G-I Holdings moved pursuant to § 105(a) of the Code seeking a preliminary injunction prohibiting the filing or prosecution of present and future asbestos claims against BMCA, pending confirmation of a plan of reorganization for G-I Holdings or the issuance of a declaratory judgment as to whether BMCA bears successor liability or alter ego liability for asbestos claims.  According to G-I Holdings, an injunction was necessary to protect the value of the estate, because otherwise BMCA would itself be forced into bankruptcy.

Moreover, contending that all asbestos claims against BMCA are also essentially pending against G-I Holdings based upon the parties' indemnification agreement, G-I Holdings argued that this Court would lose its ability to fashion a uniform and efficient method of resolving asbestos claims if the asbestos claimants were permitted to prosecute their respective claims in various courts throughout the country.  BNY appeared in the matter, joining G-I Holdings's application for a preliminary injunction.  The Committee interposed an objection, contending that this Court should not exercise jurisdiction over a non-debtor third

party by extending the automatic stay to such third parties where the litigation would otherwise not affect

property of the bankruptcy estate.[3]  By Order dated February 22, 2002,[4] this Court granted the relief

requested by G-I Holdings and entered a preliminary injunction enjoining any asbestos claimants from

prosecuting pending actions and future actions against either G-I Holdings or BMCA.  Moreover, the

preliminary injunction order permits BMCA to continue to operate its business in the ordinary course as

a non-debtor, but requires BMCA to make certain disclosures to the Committee with respect to its

operations and financing, and prohibits BMCA from engaging in certain specified transactions without first

providing thirty-days' notice to the Committee.  The transactions subject to this notice requirement included

---

[3]On February 7, 2001, G-I Holdings and BMCA commenced an adversary proceeding in this
Court for a judgment declaring that BMCA was not liable as a successor or alter ego for G-I
Holdings's asbestos liabilities.  The Committee intervened as a defendant and counterclaimed for a
judgment declaring that BMCA was liable for G-I Holdings's asbestos liabilities under theories of
successor liability and "piercing the corporate veil."  The successor liability action is currently pending in
the United States District Court for the District of New Jersey.  Moreover, on February 8, 2001, the
Committee commenced an adversary proceeding against G-I Holdings, BMCA Holdings Corporation,
and BMCA.  In this two-count adversary proceeding, the Committee first requests that the Court
substantively consolidate G-I Holdings and BMCA, *nunc pro tunc*, as of January 5, 2001, the date G-
I Holdings filed its Chapter 11 petition.  The second count seeks, in the alternative, a "permanent
mandatory injunction directing [G-I Holdings] to take all corporate action necessary to cause BMCA
to file immediately a petition under Chapter 11 of the Bankruptcy Code."  After a three day evidentiary
hearing this Court denied the Committee's request for interim substantive consolidation.  See Official
Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.), 2001 WL 1598178
(Bankr. D.N.J. 2001).  This substantive consolidation action is still pending before this Court.

[4]Although the formal preliminary injunction order was not entered until February 22, 2002, the
Court rendered its decision on the record granting the preliminary injunction on June 22, 2001.  At the
Court's direction, the parties negotiated the specific terms and conditions of the injunctive relief.  This
process took more than six months and necessitated numerous Court appearances during which the
Court provided guidance to the parties in fashioning appropriate terms and conditions to be placed in
the written preliminary injunction order.

the refinancing or replacement of BMCA's then existing credit facility with BNY, as well as the making of

any pre-payments on BMCA's outstanding public notes.

During a July 19, 2001 hearing, this Court clarified the intended scope of the preliminary injunction

order by stating:

> It was never the intention of the Court in determining that conditions be
> drafted on the injunction to not allow BMCA, which is admittedly a non-
> debtor and still remains a non-debtor notwithstanding the Debtor's
> success in obtaining a preliminary injunction, it was never the intent of this
> Court to not allow normal course transactions to proceed . . . . So if there
> has been some misapprehension to not have normal course transactions
> proceed in the normal course, I know of no authority that would have me
> impose conditions that would not allow a non-debtor to do business.
>
> [(*See Exhibits to Objection of G-I Holdings Inc. and Building
> Materials Corporation of America . . . to Motion of Official
> Committee of Asbestos Claimants for Order Directing Payments Due
> July 15, 2005 to Holders of BMCA Notes be Made in Escrow*, Exhibits
> "1," pgs. 64-66) (hereinafter "*G-I Exhibits*")].

The Court also made the following observations during the July 19, 2001 hearing:

> But, in terms of repayment of debt that would normally be repaid, I
> assume that - - I would be hard pressed to stop the repayment of normal
> debt obligations. That wasn't ever meant to be an outcome of this
> injunction proceeding or any conditions pertinent thereto. Certainly,
> information should be provided [to the Committee]. But, BMCA has to
> be able to operate as an ongoing business. We are not talking about
> insider transactions or transactions that are generally given greater scrutiny
> and are suspect, but we are talking about transactions between an arms
> length party, and subject to reporting requirements of a public company.
> Let's put it in proper context because I was never intending to put those
> kind of scriptures on a non-debtor public company.
>
> In terms of putting some reasonable conditions on the injunction, it was
> again to attempt to maintain the status quo to put the Committee and other
> parties in interest on notice of extraordinary transactions, out of the
> ordinary course transactions, to scrutinize transactions regarding insiders

and that was the intent of my decision . . . . But any conditions that would
go against the general principle of allowing the non-debtor to operate in
the normal course, I think, would have to be rejected.

[(*See G-I Exhibits*, Exhibit "1," pgs. 65-66, 72-73)].

Pursuant to the terms of the February 22, 2002 preliminary injunction order, on January 9, 2004

counsel for G-I Holdings notified counsel for the Committee of its intent to issue "up to $150 million of new

Senior Secured Notes." According to counsel for G-I Holdings, the proceeds generated from the issuance

of these notes would be used to redeem the 8 5/8% Senior Secured Notes due in 2006 under the optional

redemption provision included in the 2006 Notes. According to counsel for G-I Holdings, the redemption

was expected to cost approximately $101.4 million, while the remainder of the proceeds, approximately

$50 million, would be used for "general corporate purposes and fees," including the purchase of outstanding

BMCA Senior Notes.[5]

On February 28, 2004, the Committee filed an objection to BMCA's refinancing proposal by way

of formal motion. This motion resulted in a published decision, captioned, G-I Holdings, Inc. v. Those

Parties Listed on Exhibit A (In re G-I Holdings, Inc.), 313 B.R. 612 (Bankr. D.N.J. 2004). In its motion,

the Committee sought various forms of relief. First, the Committee requested that the Court modify the

February 22, 2002 Preliminary Injunction so as to permit the Committee to commence an adversary

proceeding as the representative of G-I Holdings's bankruptcy estate for the purposes of: a) avoiding and

-----

[5]During a conference call conducted by the Court on February 13, 2004, counsel for BMCA
informally advised both the Committee and the Court that it was modifying the terms of the proposed
refinancing transaction. Counsel for BMCA stated that BMCA may wish to draw down on its existing
$350 million line of credit in order to fund the pre-payment of its outstanding notes, and then repay any
amounts drawn from its line of credit through the issuance of new notes. The Committee objected to
this alternate method of pre-paying the notes due in December of 2006.

recovering the transfer of GAF Corporation's roofing business to BMCA in 1994;[6] b) avoiding certain liens imposed on the assets of that roofing business in connection with a December, 2002 refinancing;[7] and c) avoiding and recovering payments made "under color of those liens" after the filing of G-I Holdings's bankruptcy case.  Second, the Committee requested that the Court confer upon it, pursuant to §§ 1103(c)(5), 1109(b), and 105 of the Bankruptcy Code the requisite authority to file and prosecute the contemplated adversary proceeding on behalf of the G-I Holdings's bankruptcy estate and its creditors. Third, the Committee asked that the Court prohibit BMCA from carrying out its proposed issuance of new public notes, or any other related financing transaction, pending the resolution of its motion.  Fourth, the Committee sought an order "'prohibiting BMCA from pre-paying outstanding notes as an inducement to existing Noteholders to 'roll over' their present holdings by investing in BMCA's proposed new notes.'" See In re G-I Holdings, Inc., 313 B.R. at 620.

More specifically, the Committee proposed to assert two sets of claims.  The first set of claims contemplated by the Committee would challenge the Pushdown as a fraudulent conveyance of G-I Holdings's roofing business under state law pursuant to § 544(b) of the Bankruptcy Code.  The Committee intended to sue BMCA as the "initial transferee" under § 550(a)(1) of the Code and to join the BNY Banks and the Noteholders as "mediate or immediate transferees" under § 550(a)(2) on the theory that the Securitization transaction "'constituted a subsequent transfer of interests in property that had first changed hands in the Pushdown.'" 313 B.R. at 624.     The second set of claims proposed by the Committee

---

[6]The parties colloquially refer to this transaction as the "Pushdown" transaction.

[7]The parties colloquially refer to this transaction as the "Securitization" transaction.  In short, the Securitization constituted a first lien in favor of a consortium of banks led by The Bank of New York, and a second lien in favor of the holders of BMCA's publicly-issued notes.

13

would challenge the Securitization transaction and the subsequent payments to the BNY Banks and the Noteholders "'as voidable and recoverable transfers under 11 U.S.C. §§ 544(b), 547(b), 548(a), 549(a), and 550(a)'" of the Bankruptcy Code. 313 B.R. at 625. According to the Committee, the BNY Banks and the Noteholders would be joined on these claims "'as initial, mediate, or immediate transferees of the encumbrances granted in the Securitization'" transaction. <u>Id.</u> The Committee asserted that the various claims challenging the Securitization transaction "'w[ould] be predicated on the contention that BMCA must be collapsed with G-I [Holdings] on grounds of alter ego or substantive consolidation, or that the assets subjected to the liens constitute property of [G-I Holdings] that was fraudulently conveyed in the Pushdown.'" <u>Id.</u>

In the decision which resulted in the published opinion, and subsequently this adversary proceeding, this Court granted the Committee "leave to file an adversary proceeding challenging the 1994 Pushdown transaction on behalf of G-I Holdings asserting a fraudulent conveyance claim premised on actual fraud pursuant to § 544(b) of the Code and N.J.S.A. 25:2-25a against BMCA, BNY, and the Noteholders." <u>Id.</u> at 648. Moreover, the Court also permitted the Committee to file claims based on both actual and constructive fraud on behalf of G-I Holdings under § 544(b) of the Code and N.J.S.A. 25:25a, N.J.S.A. 25:2-25b and N.J.S.A. 25:27a against BMCA, BNY, and the Noteholders "utilizing the standing of the New Jersey Department of Environmental Protection as an unsecured creditor of G-I Holdings." <u>Id.</u> at 648-49. With respect to the Committee's challenge to the Pushdown transaction, the Court permitted a claim for recovery against BMCA as the initial transferee under § 550(a)(1) of the Code and against BNY and the Noteholders as mediate or immediate transferees under § 550(a)(2) of the Code. <u>Id.</u> at 658-59.

14

With respect to the Securitization transaction, this Court concluded that the Committee had failed to present a colorable claim "because a valid affirmative defense to the proposed action exist[ed]; namely, lack of subject matter jurisdiction." Id. at 652.  Nonetheless, the Court held that in the event the Committee is successful in either the pending successor liability action or the pending substantive consolidation action, it would be permitted to once again seek leave from the Court to file an adversary proceeding challenging the Securitization transaction.  Id. at 653.  Further, the Court granted BMCA's request to issue new senior secured notes.  As this Court noted, the Committee's attempt to prevent BMCA from issuing secured notes "strikes at the heart of BMCA's business decisions." Id. at 657. Relying on the statements made by this Court on the record on July 19, 2001, the Court once again reiterated its position that "it was never this Court's intention to prevent BMCA, significantly a non-debtor, from conducting business and engaging in normal course transactions." Id.

As a result of the June 8, 2004 published opinion, the Committee filed the present adversary proceeding.  On May 17, 2005, the Committee filed the instant motion seeking "the entry of an order pursuant to section 105(a) of the Bankruptcy Code directing that [BMCA] pay into escrow $150 million falling due on July 15, 2005, to holders of BMCA's notes issued on or about July 17, 1998 (the '2005 Noteholders')."  (*See Motion of the Official Committee of Asbestos Claimants for Entry of Order Directing that Payment to Holders of BMCA Notes Issued on July 17, 1998 be made in Escrow*, pg. 2) (hereinafter "*Comm. Br.*").  According to the Committee:

> The looming repayment of $150 million in principal to the 2005 Noteholders threatens to impair the Court's jurisdiction by rendering the estate's claims against them moot before the Court can adjudicate the merits of those claims.  Fortunately, section 105(a), the "All Writs" provision of the Bankruptcy Code, authorizes the Court to take any action

necessary or appropriate to preserve the G-I [Holdings] estate's avoidance claims and to protect the Court's own effective jurisdiction over this matter.

In order to preserve the Court's jurisdiction and to maintain the *status quo*, it is imperative that this Court order that the $150 million in principal payments due to be made to the 2005 Noteholders on July 15, 2005 be held in escrow pending final adjudication of the merits of the claims asserted herein.

[(*Comm. Br.*, pgs. 3-4)].

The Committee summarizes its legal argument as follows:

This Court has the power under 11 U.S.C. § 105(a) to enjoin the $150 million note payment outright in order to implement the avoidance power provisions of the Bankruptcy Code, foster the reorganization of G-I [Holdings], and safeguard the effectiveness of bankruptcy jurisdiction in this adversary proceeding.

Section 105(a) of Title 11 is the "All Writs" provision of the Bankruptcy Code. It serves the same functions in bankruptcy cases that section 1651 of the Judicial Code plays in civil litigation outside of bankruptcy. Under its "All Writs" powers, this Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.

Another recognized function of "All Writs" jurisdiction, both in and out of the bankruptcy context, is to protect the effective jurisdiction of the courts by preventing matters that come before them from becoming moot before judgment can be rendered on the merits. Here, these proper uses of section 105(a) combine to give this Court ample authority to enjoin the payment and redemption of BMCA's outstanding 2005 notes, to preserve the estate's interest in claims and causes of action against the 2005 Noteholders, and to safeguard the jurisdiction of this Court over this adversary proceeding.

[(*Comm. Br.*, pgs. 19-20)].

16

For the reasons that follow, the Committee's motion seeking the entry of an order directing BMCA to pay into escrow the $150 million falling due on July 15, 2005 pending "final adjudication of the merits" is hereby denied.[8]

## II.    Legal Discussion

The Committee correctly notes that § 105(a) of the Bankruptcy Code provides that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" Title 11.  See 11 U.S.C. § 105(a) (West 2005).  Without question, "[b]ankruptcy courts are essentially courts of equity, governed by equitable principles."  Institut Pasteur v. Cambridge Biotech Corp. (In re Cambridge Biotech Corp.), 186 B.R. 9, 17 (Bankr. D. Mass. 1995) (citations omitted), aff'd, 212 B.R. 10 (D. Mass. 1997), aff'd, 186 F.3d 1356 (Fed. Cir. 1999).  However, this generalized equitable power is not without restriction.  Section 105(a) of the Code does not "elevate a bankruptcy court to 'super court' status; a bankruptcy court's equitable powers are available to serve any constituency involved in any particular case, but may be exercised only within the confines of the Code."  Florida Bay Banks, Inc. v. Florida Dep't of Banking & Fin. (In re Florida Bay Banks, Inc.), 156 B.R. 673, 677 (Bankr. N.D. Fla. 1993) (citing Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988)).  That is, pursuant to § 105(a), a bankruptcy court "must locate its equitable authority in the Bankruptcy Code."

---

[8]At oral argument, counsel for the Committee advised the Court that it was "narrowing the relief" it is seeking in this motion, and thereby submitted a revised form of order to the Court.  In essence, the Committee is now offering to bifurcate the proposed $150 million escrow payment and permit BMCA to pay any particular Noteholder "in full" so long as the Noteholder in exchange agrees to waive any future defense of "mootness" to the Committee's clawback efforts.  According to counsel for certain Noteholder defendants, none of these Noteholder defendants has or will agree to such a waiver.

Pacific Shores Dev., LLC v. At Home Corp. (In re At Home Corp.), 392 F.3d 1064, 1070 (9th Cir. 2004) (citation omitted).  See also In re The Colad Group, Inc., 324 B.R. 208, 213 (Bankr. W.D.N.Y. 2005) ("'By its very terms, section 105(a) limits the bankruptcy court's equitable powers, which must and can only be exercised within the confines of the Bankruptcy Code, and cannot be used in a manner inconsistent with the commands of the Bankruptcy Code'") (citation omitted).  Moreover, a bankruptcy court's utilization of its equitable powers under § 105(a) of the Code is discretionary and must be "'carefully honed in light of the facts of the case, applicable precedent and appropriate policy.'" In re Charles & Lillian Brown's Hotel, Inc., 93 B.R. 49, 55 (Bankr. S.D.N.Y. 1988) (citing Lesser v. A-Z Assocs. (In re Lion Capital Group), 44 B.R. 690, 701 (Bankr. S.D.N.Y. 1984).  See also Twelve Percent Secured Noteholders v. Amarex, Inc. (In re Amarex, Inc.), 30 B.R. 763, 767 (Bankr. W.D. Okla. 1983)("A bankruptcy court is a court of equity which may, in its discretion, deny relief which is within its powers or grant relief upon some condition dictated by equitable principles").

To the extent applicable, the federal "All Writs" provision codified by 28 U.S.C. § 1651(a) provides as follows: "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." See 28 U.S.C. § 1651(a) (West 2005).[9]  The basic purpose of § 1651(a) is to assure to the various federal courts the power to issue appropriate writs and orders of an auxiliary nature in aid of their respective jurisdictions as conferred by other provisions of law.  Edgerly v. Kennelly, 215 F.2d 420, 422

---

[9]Black's Law Dictionary defines "writ" as a "court's written order, in the name of a state or other competent legal authority, commanding the addressee to do or refrain from doing some specified act."  Black's Law Dictionary 1640 (8th ed. 2004).

(7th Cir. 1954), cert. denied, 348 U.S. 938 (1955), overruled on other grounds by Stone v. Morris, 546

F.2d 730 (7th Cir. 1976). Similar to the power conferred by § 105(a) of the Bankruptcy Code, the power

conferred upon federal courts by operation of § 1651(a) "may be granted or withheld in the sound

discretion of the court. Roche v. Evaported Milk Ass'n, 319 U.S. 21, 25 (1943) (citations omitted). See

also Padilla ex rel. Newman v. Bush, 233 F. Supp. 2d 564, 603 (S.D.N.Y. 2003) (noting that the decision

whether to grant or withhold an order under the All Writs Act lies within the sound discretion of the court),

rev'd on other grounds by Rumsfeld v. Padilla, 542 U.S. 426 (2004); Morrow v. Dist. of Columbia, 417

F.2d 728, 738 (D.C. Cir. 1969) ("The Supreme Court has stressed the theme that the issuance of the writ

is a matter of sound discretion"). In addition, the All Writs Act, even if found to be applicable to a

particular case, "is entirely permissive in nature; it in no way mandates a particular result or the entry of a

particular order." Application of the United States of Am. in the Matter of an Order Authorizing the Use

of a Pen Register or Similar Mech. Device, 538 F.2d 956, 961 (2d Cir. 1976), rev'd on other grounds sub

nom., United States v. New York Tel. Co., 434 U.S. 159 (1977).

The Court disagrees with the Committee's argument that an injunction pursuant to the All Writs Act

is necessary to "protect the Court's own effective jurisdiction over this matter." (Comm. Br., pg. 3).

Reaching this conclusion requires an examination of the proper scope of the "necessary in aid of

jurisdiction" language contained within 28 U.S.C. § 1651(a). As the United States Court of Appeals for

the Third Circuit stated in Carlough v. Amchem Products, Inc., in order for the "'necessary in aid of

jurisdiction' exception to apply, 'it is not enough that the requested injunction is related to that jurisdiction,

but it must be necessary in aid of that jurisdiction.'" 10 F.3d 189, 202 (3d Cir. 1993) (citations omitted)

(emphasis in original). In this regard, the Third Circuit Court of Appeals clearly opined that the exception

19

authorizing injunctions necessary in aid of the court's jurisdiction applies "'only to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case.'" Id. (citation omitted).

Simply stated, the ordinary instances in which federal courts issue injunctions pursuant to the All Writs Act in order to preserve their jurisdiction are markedly different from the procedural posture of this adversary proceeding. In Carlough, a class action complaint, an answer, and a stipulation of settlement were simultaneously filed in district court. Id. at 194. The complaint was brought on behalf of Edward M. Carlough and other named plaintiffs representing the putative class consisting of "all persons" who had been exposed to the defendants' asbestos-containing products. Id. The Carlough plaintiffs sought "recovery for asbestos-related personal injury caused by the exposure of members of the putative class to the asbestos and asbestos-containing" products of the defendants. Id. at 195. The class certification order indicated "that notice to absent class members would be given as to the pendency of the federal class action and of their rights to exclude themselves from the class." Id.

While the proposed settlement remained under consideration by the federal court, Gregory Gore, along with several other plaintiffs, "filed a related asbestos class action complaint . . . in state court . . . on behalf of themselves and as representatives of a putative class of plaintiffs similarly situated" in the particular state. Id. The state court class action named the same defendants as in the federal class action,

> was commenced prior to the impending "opt out" period of the federal action and prior to the district court's determination of its subject matter and personal jurisdiction, and [sought] as relief a declaration that the proposed [federal court] settlement [was] unenforceable and not entitled to full faith and credit in the . . . state court[ ] and [was] not binding on members of the purported [state] class . . . . [Further,] [t]he class of

persons defined in the [state court] suit parallel[ed] that defined in the federal [court] suit.

[Id. at 195-96].

The defendants subsequently sought an order from the district court enjoining the state class plaintiffs from taking further steps to prosecute their claims in state court. Id. at 196. The district court issued a preliminary injunction restraining and enjoining the state class plaintiffs from prosecuting their claims "in any other forum." Id. The district court relied upon the All Writs Act in issuing the preliminary injunction. Id. at 197.[10] The Third Circuit Court of Appeals affirmed the issuance of the injunction, noting that a state court ruling challenging the propriety of the federal class action and permitting a "mass opting out of all" state court plaintiffs "[a]t this mature phase of the settlement proceedings and after years of pre-trial negotiation . . . clearly would be disruptive to the district court's ongoing settlement management and would jeopardize the settlement's fruition." Id. at 204. See also Three J Farms, Inc. v. Plaintiffs' Steering Comm. (In re Corrugated Container Antitrust Litig.), 659 F.2d 1332, 1334-36 (5th Cir. 1981) (enjoining a state court proceeding in order to protect federal court jurisdiction over an imminent settlement), cert. denied, 456 U.S. 936 (1982).

Contrary to the Carlough litigation and similarly situated cases, this adversary proceeding does not present an instance where the federal court must act in order to protect the integrity of its jurisdiction. See, e.g., Fed. Trade Comm'n v. Dean Foods Co., 384 U.S. 597, 605 (1966) (holding that a federal court of appeals has the authority to issue a preliminary injunction under the All Writs Act to prevent a corporate

_____

[10]The district court also relied upon the Anti-Injunction Act, 28 U.S.C. § 2283 (1970), for authority to issue the preliminary injunction. Id. at 197.

21

merger "upon a showing that an effective remedial order, once the merger was implemented, would otherwise be virtually impossible, thus rendering the enforcement of any final decree of divestiture futile"). Nor is there any need to issue the requested injunction "to prevent the defeat or impediment of" this Court's jurisdiction to fully adjudicate this adversary proceeding. See Steelman v. All Continent Corp., 301 U.S. 278, 289 (1937). There is no related or parallel state court proceeding that could affect the Committee's ability to prosecute its avoidance action against BMCA, BNY, and the Noteholder defendants. As BNY aptly notes, payment of the 2005 Notes by BMCA will not affect the Committee's ability to pursue the Pushdown as a fraudulent conveyance. (*See Objection of the Bank of New York, as Indenture Trustee, to the Motion of Official Committee of Asbestos Claimants for Entry of an Order Directing that Payment to Holders be made in Escrow*, pg. 9) (hereinafter "*BNY Br.*").

Assuming that the $150 million payment to the 2005 Noteholders is made, the Committee will still be unhampered in prosecuting its avoidance action and seeking its requested relief from BMCA, BNY, and possibly still, the Noteholder defendants. In other words, payment of the 2005 Notes will not preclude the Committee's avoidance action, but *may* provide the Noteholder defendants with an affirmative defense against any liability. Consequently, because this Court's jurisdiction is not in jeopardy and any future order granting the Committee the relief it seeks, should it prove ultimately successful in this adversary proceeding, will not be rendered a nullity or futile, the Court will decline to exercise its discretion and enter an injunction pursuant to § 105(a) and § 1651(a).

This conclusion should not be viewed as trivializing the Committee's concern of a possible future defense of "mootness" with respect to the Noteholder defendants. Nonetheless, this Court finds the rationale advanced by the Bank of New York and the Noteholder defendants persuasive insofar as if the

2005 Notes are paid in full, "the collateral securing the 2005 Notes will no longer be pledged as security for the payment of the Notes. Instead, the value of the collateral to the extent of the lien securing the 2005 Notes will be available to BMCA and, if this Court determines in subsequent proceedings, to the Debtor's creditors." (*BNY Br.*, pg. 3). Since the Noteholders' lien constitutes a security interest in the assets of BMCA, once the debt is paid the lien is released – as is the $150 million in public debt owed by BMCA. (*See Objection of Certain Noteholder Defendants to the Official Committee of Asbestos Claimants' Motion for Entry of an Order Directing that Payment to Holders of BMCA Notes Issued on July 17, 1998 be made in Escrow*, pg. 7) (hereinafter "*Noteholders Br.*"). According to the Noteholder defendants, "[i]f the Committee eventually succeeds in this proceeding (or [in] its other actions)[,] BMCA's assets will therefore be swept into the G-I Holdings estate free of any lien granted to the 2005 Noteholders (and unburdened by an additional $150 million in debt)." (*Noteholders Br.*, pg. 7). The Court agrees with this analysis of the current posture of this adversary proceeding.

While BNY confidently asserts the $150 million payment will provide the 2005 Noteholder defendants with the affirmative defense of "mootness," no determination has yet been made that payment would in fact constitute a valid defense to an action under § 550(a)(2) of the Bankruptcy Code. While the possibility exists, it has not yet been conclusively established. In short, a possible future, valid defense is simply too speculative a concern to prompt this Court to exercise its discretion and grant the extraordinary remedy of enjoining a non-debtor's ordinary business decisions under either § 105(a) or § 1651(a).[11]

---

[11]This conclusion is further buttressed by the fact that in order for the Noteholder defendants to raise the affirmative defense of "mootness," the Committee would have to satisfy the condition precedent of proving successful in the adversary proceeding.

The Committee also cites In re International Power Securities Corp., 170 F.2d 399 (3d Cir. 1948),

for the proposition that this Court has the authority under § 105(a) or § 1651(a), or both, to issue the

requested injunction.[12]   This Court does not disagree.   However, for the reasons expressed herein, the

posture of this case militates against this Court exercising its discretion and granting the Committee's relief.

With respect to a bankruptcy court's ability to issue an injunction under either § 105(a) or § 1651(a), the

United States Court of Appeals for the Third Circuit stated as follows:

> They [bankruptcy courts] are empowered to issue an injunction in a
> summary proceeding when necessary to prevent the defeat or impairment

---

[12]In opposition to the Committee's motion, BMCA and G-I Holdings submit that the Court lacks the authority to grant the relief requested by the Committee under Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308 (1999).   Relying upon Grupo Mexicano, G-I Holdings and BMCA submit that "federal courts do not have authority to grant provisional remedies to creditors who have not received judgments against a debtor."  (*See Objection of G-I Holdings, Inc. and [BMCA] to Motion of Official Committee of Asbestos Claimants for Order Directing Payments Due July 15, 2005 to Holders of BMCA Notes be made in Escrow*, pg. 18) (hereinafter "*G-I Br.*").   In Grupo Mexicano, the United States Supreme Court held that the district court "had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages."  527 U.S. at 333. Muddying the application of Grupo Mexicano to this case is footnote 7 of the opinion.  See 527 U.S. at 324 n.7.  Footnote 7 states as follows: "[s]everal states have adopted the Uniform Fraudulent Conveyance Act (or its successor the Uniform Fraudulent Transfers Act), which has been interpreted as conferring on a nonjudgment creditor the right to bring a fraudulent conveyance claim.  Insofar as [Federal Rule of Civil Procedure] 18(b) applies to such an action, the state statute eliminating the need for a judgment may have altered the common-law rule that a general contract creditor has no interest in his [or her] debtor's property.  Because this case does not involve a claim of fraudulent conveyance, we express no opinion on the point."  Id. (internal citations omitted).  The possible upshot of footnote 7 is that a creditor prosecuting a fraudulent conveyance action, like the Committee in this case, may be able to obtain a preliminary injunction preventing the debtor from otherwise lawfully disposing of its assets, despite the fact that a judgment has not yet been entered in the creditor's favor.  Because the Supreme Court decided not to express an opinion on this issue, this Court questions whether Grupo Mexicano imposes a jurisdictional bar to the relief the Committee seeks.  Nevertheless, this Court need not decide whether, as G-I Holdings and BMCA submit, the Committee's relief is jurisdictionally barred by Grupo Mexicano because the Court is denying the Committee's motion on other grounds, and can do so without relying upon Grupo Mexicano as authority.

of their exclusive jurisdiction or to protect the property and assets of a
bankrupt wherever situated.  The power of a bankruptcy court to protect
by injunction the subject matter of its jurisdiction is inherent in the court as
a virtual court of equity and exists as well by virtue of [the precursor to
present § 105(a) and the All Writs Act].

[In re Int'l Power Sec. Corp., 170 F.2d at 402].

For the reasons expressed above, an injunction under § 105(a) or § 1651(a) is not necessary to

prevent the impairment of this Court's jurisdiction.  Moreover, an injunction pursuant to either § 105(a) or

§ 1651(a) is not necessary "to protect *the property and assets of a bankrupt*."  Id. (emphasis added).

Contrary to the circumstances in In re International Power Securities Corp., where the *debtor* undisputably

had a property interest to exercise set-off rights to a series of bonds (assuming they were in fact owned by

a specific entity), the $150 million is not owned by the Debtor, G-I Holdings, nor has it yet been

unquestionably established that G-I Holdings has any property interest in the $150 million.  The 2005 Notes

were issued by BMCA, a non-debtor, and the $150 million constitutes a repayment of debt in the ordinary

course by a non-debtor – not a utilization of assets of G-I Holdings's bankruptcy estate.

The Committee correctly notes that the injunction issued in In re International Power Securities

Corp. "was a restraining order designed to maintain the status quo of the bonds in the custodial account,

that is, to prevent their possible sale to an innocent purchaser for value, who might take title free and clear

of at least certain of the equitable set-offs assertable [by the debtor] only against Edison, the alleged owner

of the bonds."  Id. at 404-05.  But as the Third Circuit Court of Appeals recognized, the "question of

ownership of these bonds was most vital to the reorganization.  On the answer to that question critically

depended the existence or non-existence of the [debtor's] asserted equities of set-off."  Id. at 405.  If it

was ultimately "established that Edison owned the bonds the very nature and extent of its claims against the

debtor and its assets would be materially affected with a corresponding effect in the formulation of a plan

of reorganization." Id.

This determination by the Third Circuit Court of Appeals in In re International Power Securities

Corp. differs from the procedural posture of this case in two material ways. First, the injunction in In re

International Power Securities Corp. was issued to enable the court to address a limited (and perhaps

easily resolved) question fundamental to the bankruptcy case; namely, the ownership of the bonds. Here,

the Committee is asking the Court to issue an injunction not to permit a fundamental question to be

addressed in the bankruptcy case, but to restrain a non-debtor from acting in the ordinary course of

business. Second, unlike the circumstance in In re International Power Securities Corp. where the issuance

of the injunction so as to permit the court to resolve the question of ownership of the bonds "was most vital

to the reorganization," preventing non-debtor BMCA from making its regularly scheduled payment to the

2005 Noteholders is not necessarily vital to the success or failure of G-I Holdings's reorganization efforts.

Rather, the issue of whether G-I Holdings can successfully grapple with its potential massive exposure to

asbestos-related personal injury lawsuits is vital to its reorganization efforts. While the Committee correctly

notes that In re International Power Securities Corp. gives the Court the power to issue an injunction, the

Court will nonetheless decline to exercise its discretion and not enter an injunction for the reasons

expressed herein.

Additional circumstances militate against issuing the injunction the Committee seeks. As previously

indicated, a bankruptcy court can only exercise its equitable powers under § 105(a) "within the confines

of the Code." Florida Bay Banks, Inc., 156 B.R. at 677. While the Committee invokes the avoidance

powers contained within the Code as the authority for the Court to issue an injunction pursuant to § 105(a),

substance over form demonstrates otherwise. The issuance of the requested injunction under § 105(a) is

not "necessary" for the Committee "to carry out" the avoidance provisions of the Bankruptcy Code.

Rather, in essence the Committee is asking this Court to enjoin a non-debtor entity from conducting normal

business transactions by preventing the repayment of regularly scheduled debt instruments to non-debtor

third parties. As indicated during the July 19, 2001 hearing, this Court knows of "no authority that would

have [it] impose conditions that would not allow a non-debtor to do business." (*G-I Exhibits*, Exhibit "1,"

pg. 65). Even accepting that § 1651(a) of the All Writs Act provides the Court with such authority, as the

Committee contends, this Court will decline to exercise its discretion and not issue the requested injunction.

Instead, the Court will remain steadfast in its position not to impose "[these] kind[s] of [strictures] on a non-

debtor public company." (*G-I Exhibits*, Exhibit "1," pg. 66).

Further, the Committee submits that its requested relief would "merely require an escrowing of the

proceeds pending a resolution of this adversary proceeding." (*Comm. Br.*, pg. 28). However, this

contemplated payment into escrow is not as simple as the Committee suggests. Given the breadth and

complexity of this adversary proceeding, which is still in its early stages, it is reasonable to conclude that

this proceeding could take several more years before a final adjudication on the merits, not including time

for any appeals. According to BNY, "because a deposit into escrow would not fulfill . . . BMCA's

obligations to pay the 2005 Notes at maturity, interest would accrue under the 1998 Indenture [Agreement]

at 7 3/4%, plus interest on such interest, compounded daily." (*BNY Br.*, pg. 5). Section 2.12 of the 1998

Indenture Agreement provides in relevant part as follows: "[i]f the Company [BMCA] defaults in a payment

of interest on the Securities, it shall pay the defaulted interest, plus, to the extent permitted by law, any

interest payable on the defaulted interest, to the Persons who are Securityholders on a subsequent special

record date." (*See Affidavit of Leo T. Crowley, Esq.*, Exhibit "B") (hereinafter "*Crowley Aff.*").

According to BNY, "[t]his rate of interest is significantly higher than any interest that can be earned on the

funds held in the proposed escrow account." (*BNY Br.*, pg. 5). Moreover, BNY submits that the available

investment options for the escrowed funds would at best yield an interest rate of 3.52%. (*BNY Br.*, pg. 5).

Consequently, BNY contends "that the money held in escrow would not be able to earn the interest rate

needed in order to satisfy the interest obligations under the 1998 Indenture [Agreement]," creating a

negative interest spread of several million dollars "between interest earned and interest owed." (*BNY Br.*,

pg. 5). The Committee fails to satisfactorily address how to overcome this shortfall as a result of BMCA's

breach of the 1998 Indenture Agreement, and the Court declines to issue a permissive injunction that could

potentially wreak havoc upon BMCA's financial obligations.

Perhaps more significantly, if BMCA fails to pay the principal and accrued interest on the 2005

Notes on their maturity date, this will cause BMCA to default on its obligations under the 1998 Indenture

Agreement. Section 6.01 of the 1998 Indenture Agreement provides that an "Event of Default" occurs if

"(1) [BMCA] defaults in the payment of interest on any Security when the same becomes due and payable

and the default continues for a period of 30 days," or (2)(i) [BMCA] defaults in the payment of the

principal of any Security when the same becomes due and payable at maturity or otherwise or (ii) [BMCA]

fails to redeem or repurchase Securities when required pursuant to this Indenture or the Securities . . . ."

(*Crowley Aff.*, Exhibit "B"). An injunction issued by this Court causing BMCA to default on the 1998

Indenture Agreement could potentially have a disastrously "cascading effect" upon BMCA's financial

condition and the financial condition of its third-party creditors.

Pursuant to § 6.02 of the 1998 Indenture Agreement, captioned "Acceleration," if a default "occurs and is continuing, the Trustee, by written notice to [BMCA], or the Holders of at least 25% in aggregate principal amount of the outstanding Securities, by written notice to [BMCA] and the Trustee, may declare all unpaid principal of and accrued interest on the Securities then outstanding to be due and payable." (*Crowley Aff.*, Exhibit "B").  Upon a declaration of acceleration, "such amount shall be due and payable immediately." (*Crowley Aff.*, Exhibit "B").  In addition to the immediate acceleration of debt upon default, § 6.03 of the 1998 Indenture Agreement provides that upon an outstanding default where the Holders are entitled to payment as a result of acceleration, "the Trustee may pursue any available remedy by proceeding at law or in equity to collect the payment of principal of and/or interest on the Securities or to enforce the performance of any provision of the Securities or this Indenture."  (*Crowley Aff.*, Exhibit "B").

In addition to directly affecting the relationship between BMCA and its creditors under the 1998 Indenture Agreement, a default by BMCA with respect to the 1998 Indenture Agreement will trigger a slew of cross-defaults under other financial agreements, including several other debt indentures.  For example, § 6.01(6) of the Indenture dated as of October 20, 1997 for the 8% Senior Notes due 2007 (the "1997 Indenture Agreement"), the Indenture dated as of December 3, 1998 for the 8% Senior Notes due 2008 (the "December 1998 Indenture Agreement"), as well as the 1998 Indenture Agreement provides that a default under one Indenture Agreement constitutes a default under the other Indenture Agreements. Section 6.01(6) of these Indenture Agreements provides as follows:

> An "Event of Default" occurs if principal of or interest on Debt of the Company [BMCA] or any of its Significant Subsidiaries is not paid within any applicable grace period or is accelerated by the holders thereof because of a default and the total amount that is unpaid or accelerated

29

exceeds $15,000,000 or its foreign currency equivalent and such default
continues for five days after notice . . . .

[(*Crowley Aff.*, Exhibits "B" and "E")].

Furthermore, a breach by BMCA of the 1998 Indenture Agreement would also cause a cross-default by BMCA under its $350,000,000 million revolving Credit Agreement with a consortium of lenders led by Citibank dated as of July 9, 2003.  (*G-I Exhibits*, Exhibit "2").  Specifically, § 6.01(e) of the July 9, 2003 Credit Agreement provides that an "Event of Default" will occur if

> any Loan Party[13] or any of its Subsidiaries shall fail to pay any principal of,
> premium or interest on or any other amount payable in respect of any
> Debt of such Loan Party or such Subsidiary (as the case may be) that is
> outstanding in a principal amount of at least $15 million either individually
> or in the aggregate for all such Loan Parties and Subsidiaries (but
> excluding Debt outstanding hereunder), when the same becomes due and
> payable (whether by scheduled maturity, required prepayment,
> acceleration, demand or otherwise), and such failure shall continue after
> the applicable grace period, if any, specified in the agreement or
> instrument relating to such Debt; or any other event shall occur or
> condition shall exist under any agreement or instrument relating to any such
> Debt and shall continue after the applicable grace period, if any, specified
> in such agreement or instrument, if the effect of such event or condition is
> to accelerate, or to permit the acceleration of, the maturity of such Debt
> or otherwise to cause, or to permit the holder thereof to cause, such Debt
> to mature; or any such Debt shall be declared to be due and payable or
> required to be prepaid or redeemed (other than by a regularly scheduled
> required prepayment or redemption), purchased or defeased, or an offer
> to prepay, redeem, purchase or defease such Debt shall be required to be
> made, in each case prior to the stated maturity thereof . . . .

[(*G-I Exhibits*, Exhibit "2")].

Section 6.01 of the Credit Agreement further provides that if an Event of Default occurs,

---

[13]Section 1.01 of the Credit Agreement defines "Loan Party" as BMCA and the "Subsidiary
Guarantors."  (*G-I Exhibits*, Exhibit "2").

the Administrative Agent (i) shall at the request, or may with the consent,
of the Required Lenders, by notice to [BMCA], declare the Commitments
of each Lender Party and the obligation of each Lender Party to make
Advances (other than Letter of Credit Advances by the Issuing Bank or
a Lender pursuant to Section 2.03(c) and Swing Line Advances by a
Lender pursuant to Section 2.02(b)) and of the Issuing Bank to issue
Letters of Credit to be terminated, whereupon the same shall forthwith
terminate, and (ii) shall at the request, or may with the consent, of the
Required Lenders, (A) by notice to [BMCA], declare the Notes, all
interest thereon and all other amounts payable under this Agreement and
the other Loan Documents to be forthwith due and payable, whereupon
the Notes, all such interest and all such amounts shall become and be
forthwith due and payable, without presentment, demand, protest or
further notice of any kind, all of which are hereby expressly waived by
[BMCA], (B) by notice to each party required under the terms of any
agreement in support of which a Standby Letter of Credit is issued,
request that all Obligations under such agreement be declared to be due
and payable . . . .

[(*G-I Exhibits*, Exhibit "2")].

According to BMCA and G-I Holdings, causing BMCA to default on its revolving credit facility,

given the remedies available to its institutional lenders under § 6.01, enables the lenders to refuse "to make

advances or issue letters of credit, thereby depriving the Company of needed liquidity." (*G-I Br.*, pg. 4).

As submitted by BNY, as a result of these cross-defaults "BMCA likely would have no choice but to file

for Chapter 11 relief . . . ." (*BNY Br.*, pg. 6). While the Court cannot predict how, and in what ways, a

default by BMCA under the 1998 Indenture Agreement would ultimately affect its financial condition as

a result of these various cross-defaults, it is certainly clear that a default could in fact cause substantial

financial harm to BMCA. In response to this prospect, the Committee submits the following:

To date, G-I [Holdings], BMCA and those financial creditors have
worked hand in glove to *prevent* a bankruptcy filing by BMCA in order
to forestall their day of reckoning in apparent recognition of the fact that
their interests will be at much greater risk if BMCA went into Chapter 11.

31

There is no basis to believe at this point that BMCA's financial creditors would change course and declare defaults or take other action that would precipitate such a filing merely because of a holding injunction that places funds into an interest-bearing escrow for their benefit if they ultimately succeed in this litigation. Any slight risk that may exist is further reduced by the proposed waiver provisions that would afford Noteholders the opportunity to obtain payment by merely agreeing to forgo their opportunity to whipsaw the estate by asserting that receipt of payment would place the proceeds beyond the reach of this Court.

[(*See Reply in Support of Motion of the Official Committee of Asbestos Claimants for Entry of Order Directing that Payment to Holders of BMCA Notes Issued on July 17, 1998, be made in Escrow*, pg. 16) (emphasis in original) (hereinafter "*Comm. Reply Br.*")].

Simply stated, this Court will not exercise its discretion under either § 105(a) or § 1651(a), or both, and issue an injunction that could possibly financially harm a non-debtor, public company based solely on the Committee's assumption that BMCA's financial creditors will not change course and declare defaults or take other action to exercise their contractual rights. While BMCA's financial creditors may have an interest in keeping the Company from filing for Chapter 11 relief, this cannot be predicted with any precise accuracy. Further, this Court disagrees with the Committee's conclusion that a default under the 1998 Indenture Agreement and cross-defaults under the other Indenture Agreements and the revolving Credit Agreement only poses a "slight risk" to the financial condition of BMCA. Therefore, the Committee's motion is hereby denied.

In response to the Committee's motion for relief under § 105(a) or § 1651(a), or both, the objecting defendants have raised the issue that the Committee is seeking relief under the All Writs Act and § 105(a) of the Bankruptcy Code in an attempt to evade the "traditional" standards for an injunction

pursuant to Federal Rule of Civil Procedure 65.[14]   In contrast, the Committee contends that a federal court "is not bound by the standards of Rule 65 of the Federal Rules of Civil Procedure.  The All Writs Act, and the Bankruptcy Code's 'All Writs' provision, provide independent statutory grounds for the issuance of an injunction separate and apart from Rule 65."   (*Comm. Br.*, pgs. 25-26).   In responding to the Committee's argument, G-I Holdings and BMCA argue "that an injunction pursuant to section 105(a) cannot be issued without satisfying the Rule 65 factors."   (*G-I Br.*, pg. 23).   The competing parties' positions find support in the caselaw.   See, e.g., Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1100 (11th Cir. 2004) ("The requirements for a traditional injunction do not apply to injunctions under the All Writs Act because a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns") (citing United States v. New York Tel. Co., 434 U.S. 159, 174 (1977) (affirming grant of injunction under the All Writs Act without regard to traditional four factors); In re Baldwin-United Corp., 770 F.2d 328, 338 (2d Cir. 1985) (holding that an injunction issued under the All Writs Act which did not comply with the requirements of Federal Rule of Civil Procedure 65 did not constitute a "fatal defect"); But see Florida Med. Ass'n, Inc. v. United States Dep't of Health, Educ. & Welfare, 601 F.2d 199, 202 (5th Cir. 1979) ("[T]he All Writs Act does not free a district court from the restraints of Rule 65").

As demonstrated by these conflicting decisions, the question of whether the "traditional" injunction factors apply when a federal court issues an injunction pursuant to the All Writs Act is not free from doubt. However, the United States Court of Appeals for the Second Circuit in In re Baldwin-United Corp. may

---

[14]Although the parties refer to the traditional injunction as a Rule 65 injunction, the actual text of Federal Rule of Civil Procedure 65 does not include the factors a movant must satisfy before a federal court will issue a traditional injunction.

33

provide the most reasonable explanation on the relation between a traditional injunction and an injunction

issued under § 1651(a).  The Second Circuit Court of Appeals initially observed that the All Writs Act

"permits a district court to enjoin actions in state court where necessary to prevent re-litigation of an existing

federal judgment . . . ."  In re Baldwin-United Corp., 770 F.2d at 335 (citation omitted).  However,

"[e]ven before a federal judgment is reached . . . the preservation of the federal court's jurisdiction or

authority over an ongoing matter may justify an injunction against actions in state court."  Id.  Interpreting

the All Writs Act to be a tool in the preservation of federal court jurisdiction, the Second Circuit Court of

Appeals subsequently examined the relation between § 1651(a) and Federal Rule of Civil Procedure 65

as follows:

> Injunctions issued under the authority of the All Writs Act stem from very
> different concerns than those motivating preliminary injunctions governed
> by Federal Rule of Civil Procedure 65.  Preliminary injunctions under Rule
> 65 are designed to preserve the status quo between the parties before the
> court pending a decision on the merits of the case at hand.  In contrast,
> injunctions [under the All Writs Act] are needed to prevent third parties
> from thwarting the court's ability to reach and resolve the merits of the
> federal suit before it.  Moreover, there is a difference between the power
> to enjoin an unrelated non-party pursuant to the All Writs Act and the
> narrower authority delineated by Rule 65(d), which confines the
> application of injunctions to parties, "their officers, agents, servants,
> employees, and attorneys, and [to] those persons in active concert or
> participation with them who receive actual notice of the order."  We do
> not believe that Rule 65 was intended to impose such a limit on the court's
> authority provided by the All Writs Act to protect its ability to render a
> binding judgment.
>
> [770 F.2d at 338-39 (citations omitted)].

If, as G-I Holdings and BMCA suggest, the practical effect of the Committee's relief is not to

protect or prevent the impairment of this Court's jurisdiction, but rather to preserve the status quo between

the Committee, G-I Holdings, BMCA, BNY, and the Noteholder defendants pending a final decision on

34

the Committee's avoidance action, then the Committee arguably would need to satisfy the standard for the issuance of a traditional injunction. Therefore, the Court will also examine the Committee's requested relief under Federal Rule of Civil Procedure 65.

The grant or denial of a preliminary injunction rests within the sound discretion of the court. Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Civil 2d § 2948 (1995) (citing Deckert v. Independence Shares Corp., 311 U.S. 282 (1940)). As noted by the Third Circuit Court of Appeals, an injunction "'is an extraordinary remedy, which should be granted only in limited circumstances.'" Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 578, 586 (3d Cir. 2000) (quoting Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989)). In exercising its discretion, before a court will issue an injunction it "must be convinced" the moving party demonstrates that the following four factors favoring relief are satisfied: 1) "the likelihood that the moving party will succeed on the merits"; 2) "the extent to which the moving party will suffer irreparable harm without injunctive relief"; 3) "the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued"; and 4) "the public interest." Id. See also Dam Things from Denmark v. Russ Berrie & Co., 290 F.3d 548, 556 (3d Cir. 2002) (reciting the established four-prong test for the grant of an injunction as: 1) whether the movant has shown a reasonable probability of success on the merits; 2) whether the movant will be irreparably injured by denial of the relief; 3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and 4) whether granting the preliminary relief will be in the public interest) (citations omitted). The second and third factors of the four-prong test require the court to balance the respective hardships between the moving and nonmoving parties. See Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Civil 2d § 2948.2 (1995) (noting that the

second and third factors bear "on the court's exercise of its discretion as to whether to grant preliminary

relief involves an evaluation of the severity of the impact on defendant should the . . . injunction be granted

and the hardship that would occur to plaintiff if the injunction should be denied"). The balance of hardships

reached by comparing the relevant harms to the moving and nonmoving party is perhaps the most important

determination for the court in deciding whether to either grant or deny injunctive relief. Hughes Network

Sys., Inc. v. Interdigital Communications Corp., 17 F.3d 691, 693 (4th Cir. 1994) (citation omitted).

Applying this four-prong test for the issuance of a traditional injunction to the present matter, the

Court concludes that the Committee cannot satisfy its heavy burden for granting the relief it seeks. In

balancing the respective hardships upon the Committee (if the injunction is not issued) and BMCA (if the

injunction is issued), this Court is convinced that issuing the injunction would result in greater harm to

BMCA. The denial of injunctive relief would not "moot" the entire adversary proceeding, but *may* provide

a valid defense to the action to a set of defendants. But as noted above, the validity of a potential

"mootness" defense has not been conclusively established. Furthermore, if one accepts the arguments

advanced by the Noteholder defendants and BNY, permitting BMCA to make the regularly scheduled

payment of principal and interest might *benefit* the Committee because the 2005 Noteholders' security

interest in BMCA's collateral (*i.e.*, the lien) would be removed. To the contrary, preventing BMCA from

making the $150 million payment in accordance with its normal debt obligations would, without question,

cause an automatic default under the 1998 Indenture Agreement. This default would enable the 2005

Noteholders to accelerate the debt under § 6.02 of the 1998 Indenture Agreement and permit the Trustee

to pursue any remedy at law or in equity to collect the payment of principal and interest under § 6.03 of

the 1998 Indenture Agreement.

Perhaps more significantly, a default by BMCA under the 1998 Indenture Agreement would cause automatic cross-defaults by BMCA under its revolving Credit Agreement, the 1997 Indenture Agreement, and the December 1998 Indenture Agreement.  While the Committee submits that BMCA's financial creditors will remain content and not exercise any of their contractual remedies, the fact remains that the cascading effect of these cross-defaults could seriously damage the current financial condition of BMCA. Causing such possible financial harm to a non-debtor, public company was never this Court's intention in issuing the Preliminary Injunction, and the specter of this potential financial harm to BMCA greatly outweighs the prejudice to the Committee should the requested injunction not be issued by the Court. Consequently, this Court concludes that the Committee has failed to satisfy the four-prong test for the issuance of a "traditional" injunction, and will deny its motion to the extent it seeks relief more properly characterized by Federal Rule of Civil Procedure 65.

Although not necessary to reach its conclusion to deny the Committee's motion, for purposes of completeness the Court will also briefly address the first and fourth factors in the four-prong test for issuing a "traditional" injunction.  With respect to the first prong, arguments have been raised as to whether the Committee can adequately demonstrate a "reasonable probability of success on the merits" in the underlying avoidance action.  The Defendants have raised various defenses to the avoidance action.  For example, the Noteholder defendants submit that they cannot be characterized as "immediate or mediate" transferees as a matter of law under the Bankruptcy Code.  (*Noteholders Br.*, pg. 11).  Moreover, according to the Noteholder defendants, in order for the Committee to prevail in the avoidance action, it must be established that:

(1) a "push down" of assets to BMCA, a company whose stock is still owned by G-I Holdings, amounts to a fraudulent conveyance even though the value of G-I Holdings's stock in BMCA has only increased since the Pushdown; (2) the grant of the Lien to public debt holders who funded the expansion of BMCA's business over a six year period (such as the 2005 Noteholders) constituted a transfer of the same assets "pushed down" to BMCA in 1994; and (3) the BMCA Noteholders, including the 2005 Noteholders, did anything other than provide capital that has improved the relative position of the asbestos claimants in the form of claim payments of monies "upstreamed" to G-I Holdings and funds used to grow the business that is now the most valuable asset of G-I Holdings.

[(*Noteholders Br.*, pgs. 10-11)].

G-I Holdings and BMCA argue the Committee's complaint fails to establish as a matter of law that the creation of BMCA and the subsequent Pushdown transaction constituted a fraudulent transfer. (*G-I Br.*, pg. 26). According to G-I Holdings and BMCA, "[t]he case law is clear, a transfer from a parent to a solvent subsidiary is presumed to be for reasonably equivalent value when the parent retains the full value of the asset transferred by its ownership of the subsidiary . . . ." (*G-I Br.*, pg. 26).

The June 8, 2004 published opinion provided the Committee with derivative standing to initiate this adversary proceeding, recognizing that the Committee had presented "colorable" claims to avoid the 1994 Pushdown transaction as a fraudulent conveyance. See In re G-I Holdings, Inc., 313 B.R. 630-50. However, providing the Committee with the authority to prosecute the avoidance action does not mean, in and of itself, that the Committee is more likely than not to ultimately prevail on the merits. Even were this Court, as urged by the Committee, to reformulate this prong of the test as an inquiry into the impact of the requested relief on the prospects for a successful reorganization, on balance the requested injunctive relief fails.

38

With respect to the fourth factor, the Court is also of the opinion that granting the Committee's requested relief is not in the public interest. As the Noteholder defendants submit, "an order from this Court that effectively prevents BMCA – a non-debtor public company – from making a long-scheduled debt maturity payment would certainly have a direct, adverse and chilling effect upon the public debt markets in this country." (*Noteholders Br.*, pg. 12). Moreover, as G-I Holdings and BMCA submit, preventing the scheduled payment to the 2005 Noteholders may cause BMCA to move closer to an eventual filing under Chapter 11 of the Bankruptcy Code, something that is undoubtedly not in the best interests of the commercial markets, not to mention BMCA's approximately 3,000 employees. (*G-I Br.*, pg. 31). While the Court is sensitive to the Committee's constituency's position, denying the requested injunctive relief does not prohibit the continuance of its avoidance action against BMCA, BNY, and the Noteholder defendants.

## III.    Conclusion

Based upon the foregoing, the Committee's motion for an order directing that BMCA pay into escrow pending the final adjudication of the merits of this adversary proceeding the $150 million due on July 15, 2005 to the holders of the 2005 Notes is hereby denied.

An order in conformance with this decision accompanies this Opinion.

_____
ROSEMARY GAMBARDELLA, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

Dated: July 12, 2005