## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

FILED
JAMES J. WALDRON, CLERK

JAN 1 9 2006

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY _M Chute_ DEPUTY

In Re:

**G-I HOLDINGS, INC. and ACI Inc.,**

                          Debtor(s).

Case No.: 01-30135 (RG)

Chapter 11

---

**OFFICIAL COMMITTEE OF ASBESTOS
CLAIMANTS OF G-I HOLDINGS INC. f/k/a GAF
CORP.,**

                          **Plaintiff(s),**

vs.

**BUILDING MATERIALS CORP. OF AMERICA,
et al,**

                          **Defendant(s).**

Adv. No.:   04-2192(RG)

**OPINION**

## APPEARANCES:

Mark E. Hall, Esq.
Riker, Danzig, Scherer, Hyland & Perretti LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
*Co-Attorney(s) for the Debtor(s) and
  Building Materials Corporation of America*

Jeffrey D. Prol, Esq.
Scott Cargill, Esq.
Lowenstein Sandler, PC
65 Livingston Avenue
Roseland, New Jersey 07608
*Co-Counsel to Official Committee of Asbestos Claimants*

Trevor W. Swett, Esq.
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, DC 20005
***Co-Counsel to Official Committee of Asbestos Claimants***

Brian P. Muething, Esq.
Keating, Muething & Klekamp, P.L.L.
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio 45202
***Co-Counsel for the Legal Representatives***
   ***of Present and Future Holders of Asbestos-Related Demands***

James J. DeLuca, Esq.
Okin Hollander & DeLuca, LLP
One Parker Plaza
Fort Lee, New Jersey 07024
***Co-Counsel for the Bank of New York in its capacity***
   ***as Indenture Trustee***

Leo T. Crowley, Esq.
Pillsbury Winthrop, LLP
1540 Broadway
New York, New York 10036
***Co-Counsel for the Bank of New York in its capacity***
   ***as Indenture Trustee***

Richard M. Meth, Esq.
Pitney Hardin LLP
P.O. Box 1945
Morristown, New Jersey 07962-1945
***Co-Counsel for Certain Noteholder Defendants***

Gregory W. Nye, Esq.
Donald J. Marchesseault, Esq.
Bingham McCutchen LLP
One State Street
Hartford, Connecticut 06103

*Co-Counsel for Certain Noteholder Defendants*

Michael F. Hahn, Esq.
Duane Morris, LLP
744 Broad Street
Newark, New Jersey 07102
*Co-Counsel for the Bank of New York*

Rosalia Niforatos , Esq.
KirkPatrick & Lockhart, Nicholson Graham LLP
One Newark Center, 10th Floor
Newark, New Jersey 07101
*Attorney(s) for HSBC USA Inc., Manufacturers & Traders Trust Co.*
  *and Mizuho Trust and Banking Co. USA*

Charles N. Panzer, Esq.
Reed Smith LLP
One Riverfront Plaza, First Floor
Newark, New Jersey 07102
*Attorney(s) for Defendants Mellon Trust of New England, N.A.,*
  *Standish Mellon Asset Management Company LLC, f/k/a Standish,*
  *Ayer and Wood, Inc. and Pareto Partners*

Leda Dunn Wettre, Esq.
Robinson & Livelli
Two Penn Plaza East
Newark, New Jersey 07105
*Co-Counsel for Defendants Goldman Sachs Group, Morgan Stanley & Co.,*
  *Spear Leads & Kellogg, LP, Piper Jaffray Companies, and CIBC World*
  *Markets, Inc.*

Michael J. Dell, Esq.
Kramer, Levin, Naftalis & Frankel, LLP
919 Third Avenue
New York, New York 10022
*Co-Counsel for Defendants Goldman Sachs Group, Morgan Stanley & Co.,*
  *Spear Leads & Kellogg, LP, Piper Jaffray Companies, and CIBC World*
  *Markets, Inc.*

Rebecca Bjork, Esq.
O'Melveny & Myers
1625 Eye Street, N.W.
Washington, D.C. 20006
**Attorney(s) for Alliance Capital Management and
   Sanford Bernstein**

Joshua A. Zielinski, Esq.
McElroy Deutsch Mulvaney & Carpenter, LLP
1300 Mt. Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962
**Attorney(s) for Morgan Keegan & Co., Waddell & Reed, and
   Union Planters**

John A. Bougiamas, Esq.
Otterbourg, Steindler, Houston & Rosen, P.C.
230 Park Avenue
New York, New York 10169
**Attorney(s) for Wachovia Bank NA and Wachovia Securities**

Gus A. Paloian, Esq.
Seyfarth Shaw LLP
55 East Monroe St. Suite 4200
Chicago, Illinois 60603
**Attorney(s) for Northern Trust Co.**

Brian H. Mukherjee, Esq.
Goodwin Procter LLP
Exchange Place, 53 State Street
Boston, Massachusetts 02109
**Attorney(s) for State Street Bank & Trust Company**

Eric E. Wohlforth, Esq.
Gibbons, DelDeo, Dolan, Griffinger et al
One Riverfront Plaza
Newark, New Jersey 07102-5497
**Attorney(s) for Dresdner Kleinwort Wasserstein Securities**

Frances S. Margolis, Esq.
Tompkins, McGuire & Wachenfeld

4

4 Gateway Center
100 Mulberry St.
Newark, New Jersey 07102
***Co-Counsel for Angelo Gordon & Co. L.P.***

Carolyn Miller, Esq.
Juan A. Skirrow, Esq.
Willkie Farr & Gallagher
787 Seventh Avenue
New York, New York 10019
***Co-Counsel for Angelo Gordon & Co. L.P.***

James C. Creel, III, Esq.
Janney Montgomery Scott, LLC
1801 Market Street - 10th Floor
Philadelphia, Pennsylvania 19103
***Attorney(s) for Janney Montgomery Scott, LLC***

Katherine Scovin, Esq.
Seward & Kissel, LLP
One Battery Park Plaza
New York, New York 10004
***Attorney(s) for Royal Bank of Canada***

Mary P. Miras, Esq.
Duval & Stachenfeld LLP
300 East 42nd Street, 3rd Floor
New York, NY 10580
***Attorney(s) for Swiss American Securities***

Thomas A. Martin, Esq.
Putney Twombly Hall & Hirson, LLP
120 Wood Avenue South
Iselin, NJ 08830
***Attorney(s) for St. Paul Guardian Insurance Company***

Douglas J. McGill, Esq.
Drinker Biddle & Reath LLP
500 Campus Drive
Florham Park, New Jersey 07932-1047
**Attorney(s) for Citibank, N.A., Citibank Private Banking Division and
Citigroup Global Markets, Inc.**

Gary M. Sarno, Esq.
Newman & Simpson, LLP
32 Mercer Street
Hackensack, New Jersey 07601
**Attorney(s) for PNC Bank, N.A.**

Amish R. Doshi, Esq.
Pitney Hardin LLP
7 Times Square
New York, New York 10036
**Attorney(s) for Fifth Third Bank**

Tonya A. Trumm, Esq.
Godfrey & Kahn, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
**Attorney(s) for Marshall & Isley Bank**

Trevor R. Hoffmann, Esq.
Luskin, Stern & Eisler, LLP
330 Madison Avenue, Suite 3004
New York, New York 10017
**Attorney(s) for Societe Generale**

David C. McGrail, Esq.
Dechert LLP
30 Rockefeller Plaza
New York, New York 10112
**Attorney(s) for Stein Roe Investment Council, Inc.**

### <u>ROSEMARY GAMBARDELLA, BANKRUPTCY JUDGE</u>

Before the Court is a motion to dismiss an adversary proceeding brought on behalf of the Debtor,

G-I Holdings, Inc. (hereinafter "G-I Holdings"), by the Official Committee of Asbestos Claimants of G-I

Holdings, Inc. (hereinafter the "Committee) against Building Materials Corporation of America (hereinafter

"BMCA") and a multitude of financial institutions.  More particularly, the following financial institutions filed

the present motion to dismiss the adversary complaint: A.G. Edwards & Sons, Inc.; AIG Life Insurance

Company; American General Life Companies, LLC; AIG SunAmerica Asset Management Corp.; Amerus

Capital Management Group, Inc.; Banc of America Securities LLC, Bank of America, N.A., Bear Stearns

Corporate Lending, Inc., As Lender; Bear Stearns Asset Management; Bear Stearns Securities Corp.;

Caywood-Scholl Capital Management, LLC; Charles Schwab & Co., Inc.; Comerica Bank; Delaware

Investment Advisers, A Series of Delaware Management Business Trust; Deutsche Bank Trust Company

Americas; Fidelity Investments Life Insurance Company; Forstmann Leff Associates L.P.; GE Financial

Assurance Holdings, Inc.; The Guardian Life Insurance Company of America; ING Investment

Management Co.; ING Ghent Asset Management LLC; Equitable Life Insurance Company of Iowa;

JPMorgan Chase Bank, N.A.; Bank One Trust Company, N.A.; Liberty National Life Insurance

Company; Thrivent Financial for Lutherans; Mass Financial Services Company; Massachusetts Investors

Trust; Massachusetts Mutual Life Insurance Company; Merrill Lynch Investment Managers, Limited

Partnership; Merrill Lynch Professional Clearing Corp.; Metropolitan Life Insurance Company; Neuberger

Berman LLC; OppenheimerFunds Distributor, Inc.; ORIX USA Corporation; PPM America Inc.; Pacific

Investment Management Company LLC; Putnam Investment Management, LLC; The TCW Group, Inc.;

UBS AG; UBS Financial Services; UBS Securities AG; U.S. Bank National Association; Union Bank of

California, N.A.; and Wells Fargo Bank, National Association (hereinafter collectively the "Noteholders"

or "Noteholder Defendants").

Subsequent to the filing of the motion to dismiss, the following financial institutions have formally

joined in the motion filed by the Noteholders: Fifth Third Bank; Angelo Gordon & Co.; Mellon Trust of

New England, N.A.; Standish Mellon Asset Management Company LLC, f/k/a Standish, Ayer and Wood,

Inc.; Pareto Partners; PNC Bank, N.A.; Amalgamated Bank; Waddell & Reed, Inc.; Morgan Keegan &

Co.; Union Planters, N.A.; Union Planters; Union Planters Trust; Societe Generale, New York Branch;

Mizuho Trust & Banking Co. (USA); HSBC USA, Inc.; Manufacturers and Traders Trust Company;

Dresdner Bank AG; Dresdner Kleinwort Wasserstein Securities, LLC; Northern Trust Company;

Wachovia Bank, NA; Wachovia Securities; Stein Roe Investment Counsel, Inc.; Pershing LLC; BNY

Capital Markets, Inc.; Citibank, N.A.; Citibank Private Banking Division; Citigroup Global Markets, Inc.;

Credit Suisse Asset Management, LLC; Royal Bank of Canada; DLJ Capital Corp.; Credit Suisse First

Boston, LLC; Investors Bank & Trust Company; Delaware Management Business Trust; First Southwest

Company; SunTrust Bank; National Financial Services LLC; and Mercantile-Safe Deposit and Trust

Company.[1]  The Bank of New York, as Indenture Trustee and former collateral agent, also filed a response

---

[1]These institutions will also be included under the denomination of "Noteholders" or
"Noteholder Defendants."  On May 27, 2005, the Committee filed a notice of voluntary dismissal
without prejudice as to the following Defendants: Amalgamated Bank; American Investors Group, Inc.;
City Securities Corp.; Dresdner Bank Aktiengesellschaft; G.E. Financial Assurance Holdings, Inc.;
Janney Montgomery Scott; Marshall & Isley Bank; PPM America, Inc.; Perius, Inc.; Piper Jaffray &
Co.; St. Paul Guardian; Stein Roe Investment Council, Inc.; Societe Generale/NY Custody; Sumitomo
Trust & Banking Co., USA; Union Bank of California; US Trust Company of NY; and Waddell &
Reed, Inc.  Similarly, on August 1, 2005, the Committee filed another notice of voluntary dismissal
without prejudice with respect to the following Defendants: AmerUS Capital Management Group, Inc.;
Brown Brothers Harriman & Co.; CIBC World Markets Corp.; Equitable Life Insurance Company of
Iowa; First Southwest Company; Goldman Sachs & Co.; Keybank, N.A.; Manufacturers and Traders
Trust Company; Mellon Trust of New England; Mercantile Safe-Deposit and Trust Company; Merrill
Lynch Investment Managers Limited Partnership; Merrill Lynch Professional Clearing Corp.; Mizuho
Trust & Banking Co., U.S.A.; Morgan Stanley & Co., Inc.; Morgan Stanley Dean Witter; ORIX USA

to the motion to dismiss.[2]

---

Corp.; Pershing, LLC; PNC Bank, N.A.; Security First Life Insurance Company of Arizona, Inc.; Spear, Leeds & Kellogg; Standish, Ayer & Wood, Inc.; Swiss American Securities, Inc.; UMB Bank, N.A.; Wachovia Bank, N.A.; and Wachovia Securities.  By letter dated December 23, 2005, counsel for the Committee stated: **Dismissed Defendants.**  Based upon responses received to the discovery authorized by the Court, the Committee has voluntarily dismissed the following defendants, without prejudice: 1) Amalgamated Bank; 2) American Investors Group; 3) AmerUs Capital Management Group, Inc.; 4) Brown Brothers Harriman & Co.; 5) CIBC World Markets: 6) Citi Securities; 7) Dresdner AG; 8) Equitable Life Insurance Company of Iowa; 9) First Southwest; 10) GE Financial Assurance Holdings, Inc.; 11) Goldman Sachs; 12) Janney Montgomery Scott; 13) Keybank, N.A.; 14) Manufacturers and Traders Trust Company; 15) Marshall & Isley Bank; 16) Mellon Trust of New England; 17) Mercantile Safe Deposit & Trust Co.; 18) Merrill Lynch Investment Managers Limited Partnership; 19) Merrill Lynch Professional Clearing Corp.; 20) Mizuho Trust; 21) Morgan Stanley & Co., Inc.; 22) Morgan Stanley Dean Witter; 23) Orix USA Corp.; 24) Pershing, LLC; 25) PNC Bank, NA; 26) PPM America; 27) Perius, Inc.; 28) Piper Jaffray; 29) Security First Life Insurance Company of Arizona, Inc.; 30) Societe Generale; 31) Spear, Leeds & Kellogg; 32) Stein Roe Investment Council, Inc.; 33) St. Paul Fire and Marine (sued as St. Paul Guardian); 34) Standish, Ayer & Wood; 35) Sumitomo Trust; 36) Swiss American Securities, Inc.; 37) UMB Bank, N.A.; 38) Union Bank of California; 39) US Trust Company of NY; 40) Wachovia Bank, N.A.; 41) Wachovia Securities; and 42) Waddell & Reed.

[2]BNY serves as indenture trustee under (i) an Indenture dated as of December 9, 1996 between Building Materials Corporation of America and BNY, as trustee, with respect to the $8 5/8\%$ Senior Notes due 2006; (ii) an Indenture dated as of July 17, 1998 between BMCA and BNY, as trustee, with respect to the $7 3/4\%$ Senior Notes due 2005; (iii) an Indenture dated as of October 20, 1997 between BMCA and BNY, as trustee, with respect to the 8% Senior Notes due 2007; and (iv) an Indenture dated as of December 3, 1998 between BMCA and BNY, as Trustee, with respect to the 8% Senior Notes due 2008 (together, the "Senior Note Indentures").  Section 7.07 of the Senior Note Indentures provides the Trustee with an indemnity from BMCA for "any and all loss, damage, claim or liability or expense . . . incurred by it in connection with the administration of [the] trust and its duties hereunder . . ."  The indemnity is secured by a lien in favor of the Trustee on all money or property held or collected by the Trustee.  BMCA, various Grantors, the Administrative Agent, the Trustee and The Bank of New York, as former collateral agent ("Former Collateral Agent") were parties to a Collateral Agent Agreement, dated December 22, 2000, under which the Former Collateral Agent held cetain collateral for the benefit of, among others, each noteholder and the Trustee, as well as for the enforcement of the Senior Note Indentures.  Pursuant to section 5.6 of the Collateral Agent Agreement, BMCA and its various subsidiaries, provided the Former Collateral Agent with an indemnity for any "liabilities, obligations, losses, damages . . . judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the . . . performance and administration of the [Collateral Agreement] and the security documents."  BNY was replaced as collateral agent by Citibank, NA in

The Committee formally opposed the motion to dismiss and the Court conducted a hearing with respect to the motion on April 5, 2005, at which time the Court reserved decision. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984. *See* 28 U.S.C. § 1334 (West 2005); *see also* 28 U.S.C. § 157(a) (West 2005). This matter is a core proceeding in accordance with 28 U.S.C. § 157(b). *See generally* 28 U.S.C. § 157(b) (West 2005). Venue is proper pursuant to 28 U.S.C. § 1409(a). *See* 28 U.S.C. § 1409(a) (West 2005). The following constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052. *See* Fed. R. Bankr. P. 7052 (West 2005).

## I.    Parties Involved In This Motion[3]

On January 5, 2001, G-I Holdings, which is a holding company, filed a voluntary petition under Chapter 11 of the Bankruptcy Code. On August 3, 2001, ACI, Inc., a subsidiary of G-I Holdings, filed a voluntary Chapter 11 petition. On October 10, 2001, this Court entered an Order directing the joint administration of the G-I Holdings and ACI, Inc. bankruptcy cases. Since the filing of its bankruptcy petition, G-I Holdings has been operating its business as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. *See* 11 U.S.C. § 1107(a)(West 2005); *see also* 11 U.S.C. § 1108

---

July 2003 in connection with the refinancing of BMCA's bank debt.

[3]A large portion of the procedural history and factual background leading up to the filing of the present motion to dismiss has been excerpted from this Court's prior published opinion, *G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612 (Bankr. D.N.J. 2004). As will be described more fully above, this published opinion resulted in the Committee's filing of the adversary proceeding against BMCA and the Noteholder Defendants, and forms the predicate for the present motion to dismiss the adversary proceeding.

(West 2005).  G-I Holdings is the successor-in-interest to GAF Corporation (hereinafter "GAF"), an entity

named in approximately 500,000 asbestos actions prior to merging into G-I Holdings.  The Committee

submits that as successor-in-interest to GAF, G-I Holdings remains liable for approximately 150,000

asbestos lawsuits filed, but unresolved, as of the petition date and for unknown numbers of asbestos claims

that will be filed in the future.

BMCA is an indirect subsidiary of G-I Holdings, and is also the primary operating subsidiary and

principal asset of G-I Holdings.  Significantly, BMCA is not a "debtor," as defined in § 101(13) of the

Bankruptcy Code, in any bankruptcy proceeding.  Established in 1994, BMCA received substantially all

the assets of GAF's roofing products business and expressly assumed $204 million of asbestos liability,

with G-I Holdings indemnifying BMCA against any additional asbestos liability.  Notwithstanding that

BMCA claims to have never manufactured any products containing asbestos,  the Company has been

named as an additional defendant in more than one thousand asbestos bodily injury lawsuits against GAF

since September, 2000.  Simply stated, the claims against BMCA are premised upon theories of successor

liability or alter ego.

The Committee is an official committee of creditors appointed on January 22, 2001 by the United

States Trustee pursuant to § 1102(a) of the Bankruptcy Code to represent those individuals who allegedly

suffer injuries related to the inhalation of asbestos from products manufactured by the predecessors of G-I

Holdings.  *See* 11 U.S.C. § 1102(a)(West 2005).  A Legal Representative, C. Judson Hamlin, has been

appointed by the Court to represent persons who hold present and future asbestos related claims against

G-I Holdings.[4]   Finally, according to the adversary complaint filed by the Committee, the various

Noteholder Defendants "are financial institutions that own or hold or have owned or held, notes issued by

BMCA."   (*See Complaint to Avoid and Recover Fraudulent Transfers*, ¶ 18) (hereinafter

"*Complaint*").

## II.     Factual and Procedural Background

On January 8, 2001, several days after filing for relief under Chapter 11 of the Bankruptcy Code,

G-I Holdings moved pursuant to § 105(a)[5] of the Code seeking a preliminary injunction prohibiting the filing

or prosecution of present and future asbestos claims against BMCA, pending confirmation of a plan of

reorganization for G-I Holdings or the issuance of a declaratory judgment as to whether BMCA bears

successor liability or alter ego liability for asbestos claims.  According to G-I Holdings, an injunction was

necessary to protect the value of the estate, because otherwise BMCA would itself be forced into

bankruptcy.

Moreover, contending that all asbestos claims against BMCA are also essentially pending against

G-I Holdings based upon the parties' indemnification agreement, G-I Holdings argued that this Court would

lose its ability to fashion a uniform and efficient method of resolving asbestos claims if the asbestos claimants

were permitted to prosecute their respective claims in various courts throughout the country.  BNY

---

[4]Section 1102(a)(1) of the Bankruptcy Code provides in relevant part: "[A]s soon as
practicable after the order for relief under [C]hapter 11 of this title, the United States trustee shall
appoint a committee of creditors holding unsecured claims and may appoint additional committees of
creditors or of equity security holders as the United States trustee deems appropriate."  11 U.S.C. §
1102(a) (West 2005).

[5]Section 105(a) of the Bankruptcy Code provides in relevant part: "[t]he court may issue any
order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."
*See* 11 U.S.C. § 105(a) (West 2005).

appeared in the matter, joining G-I Holdings' application for a preliminary injunction. The Committee

interposed an objection, contending that this Court should not exercise jurisdiction over a non-debtor third

party by extending the automatic stay to such third parties where the litigation would otherwise not affect

property of the bankruptcy estate.

On February 8, 2001, the Committee commenced an adversary proceeding against G-I Holdings,

BMCA Holdings Corporation, and BMCA (hereinafter the "Substantive Consolidation Action"). In this

two-count adversary proceeding, the Committee first requests that the Court substantively consolidate G-I

Holdings and BMCA, *nunc pro tunc*, as of January 5, 2001, the date G-I Holdings filed its Chapter 11

petition. The second count of the Substantive Consolidation Action seeks, in the alternative, a "permanent

mandatory injunction directing [G-I Holdings] to take all corporate action necessary to cause BMCA to

file immediately a petition under Chapter 11 of the Bankruptcy Code." After a three-day evidentiary

hearing this Court denied the Committee's request for interim substantive consolidation. *See Official

Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 2001 WL 1598178

(Bankr. D.N.J. 2001).[6]

On February 7, 2001, G-I Holdings and BMCA commenced an adversary proceeding in this

Court for a judgment declaring that BMCA was not liable as a successor or alter ego for G-I Holdings'

asbestos liabilities (hereinafter the "Successor Liability Action"). The Committee intervened as a defendant

and counterclaimed for a judgment declaring that BMCA was liable for G-I Holdings' asbestos liabilities

under theories of successor liability and "piercing the corporate veil." The Successor Liability Action is

---

[6]The Substantive Consolidation Action is still pending before this Court.

currently pending in the United States District Court for the District of New Jersey.[7]

By Order dated February 22, 2002[8], this Court granted the relief requested by G-I Holdings and entered a preliminary injunction enjoining any asbestos claimants from prosecuting pending actions and future actions against either G-I Holdings or BMCA. Moreover, the preliminary injunction order permits BMCA to continue to operate its business in the ordinary course as a non-debtor, but requires BMCA to make certain disclosures to the Committee with respect to its operations and financing, and prohibits BMCA from engaging in certain specified transactions without first providing thirty-days' notice to the Committee. The transactions subject to this notice requirement included the refinancing or replacement of BMCA's then existing credit facility with BNY, as well as the making of any pre-payments on BMCA's outstanding public notes.

Pursuant to the terms of the February 22, 2002 preliminary injunction order, on January 9, 2004 counsel for G-I Holdings notified counsel for the Committee of its intent to issue up to $150 million of new Senior Secured Notes. According to counsel for G-I Holdings, the proceeds generated from the issuance of these notes would be used to redeem the 8 5/8% Senior Secured Notes due in 2006 under the optional redemption provision included in the 2006 Notes. It was estimated that the redemption would cost approximately $101.4 million. The remainder of the proceeds, approximately $50 million, would be used

---

[7]The District Court withdrew the standing reference to the Bankruptcy Court.

[8]Although the formal preliminary injunction order was not entered until February 22, 2002, the Court rendered its decision on the record granting the preliminary injunction on June 22, 2001. At the Court's direction, the parties negotiated the specific terms and conditions of the injunctive relief. This process took more than six months and necessitated numerous Court appearances during which the Court provided guidance to the parties in fashioning appropriate terms and conditions to be placed in the written preliminary injunction order.

for general corporate purposes and fees, including the purchase of outstanding BMCA Senior Notes.[9]

On February 28, 2004, the Committee filed an objection to BMCA's refinancing proposal by way of a motion to modify the February 22, 2002 preliminary injunction.[10]  The Committee requested that the Court modify the preliminary injunction so as to authorize it to commence an adversary proceeding against BMCA, the Bank of New York (hereinafter "BNY"),[11] and the Noteholders.  According to the Committee, the adversary proceeding would include: 1) avoiding and recovering the transfer of G-I Holdings' roofing business to BMCA in 1994 (referred to by the parties as the "Pushdown" transaction); 2) avoiding certain liens imposed on the assets of the roofing business in connection with a December, 2000 refinancing (referred to by the parties as the "Securitization" transaction); and 3) avoiding and recovering payments made "under color of those liens" after the filing of G-I Holdings' bankruptcy case.  The Committee also sought an order pursuant to §§ 1103(c)(5), 1109(b) and 105 of the Bankruptcy Code conferring upon it the requisite authority to file and prosecute the proposed adversary proceeding on behalf of the G-I Holdings estate and its creditors.

---

[9]During a conference call conducted by the Court on February 13, 2004, counsel for BMCA informally advised both the Committee and the Court that it was modifying the terms of the proposed refinancing transaction.  Counsel for BMCA stated that BMCA may wish to draw down on its existing $350 million line of credit in order to fund the pre-payment of its outstanding notes, and then repay any amounts drawn from its line of credit through the issuance of new notes.  The Committee objected to this alternate method of pre-paying the notes due in December of 2006.

[10]As previously indicated, this motion resulted in this Court's published opinion, *G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612 (Bankr. D.N.J. 2004).

[11]The Bank of New York acted as an agent for a group of institutional lenders with revolving credit working capital agreements with BMCA.

More specifically, the Committee proposed to assert two sets of claims. The first set of claims would challenge the Pushdown as a fraudulent conveyance of G-I Holdings' roofing business under state law pursuant to 11 U.S.C. § 544(b) of the Bankruptcy Code. The Committee intended to sue BMCA as the "initial transferee" under 11 U.S.C. § 550(a)(1). Moreover, the Committee planned to join the BNY Banks and the Noteholders as "mediate or immediate transferees" under 11 U.S.C. § 550(a)(2) on the theory that the Securitization transaction constituted a subsequent transfer of interests in property that had first changed hands in the Pushdown.

The second set of claims proposed by the Committee would challenge the Securitization transaction and the subsequent payments to the BNY Banks and the Noteholders as voidable and recoverable transfers under 11 U.S.C. §§ 544(b), 547(b), 548(a), 549(a), and 550(a) of the Bankruptcy Code. According to the Committee, the BNY Banks and the Noteholders would be joined on these claims as initial, mediate, or immediate transferees of the encumbrances granted in the Securitization transaction. The Committee argued that the various claims challenging the Securitization transaction would be predicated on the contention that BMCA must be collapsed with G-I Holdings on grounds of alter ego or substantive consolidation, or that the assets subjected to the liens constitute property of G-I Holdings that was fraudulently conveyed in the Pushdown transaction.[12]

---

[12]In addition to filing an adversary proceeding, the Committee also requested that if its motion was granted, the Court should prevent BMCA from executing its proposed financial transactions for a thirty (30) day period, in order to give the Committee sufficient time to file and serve the proposed action. Finally, the Committee also sought to prohibit BMCA from pre-paying outstanding notes as an inducement to existing Noteholders to 'roll over' their present holdings by investing in BMCA's proposed new notes, and from using BMCA's short-term bank credit facility to pre-pay or repurchase long-term note obligations. The Court denied these forms of relief.

## A.    The "Pushdown" Transaction

In early 1994, GAF Building Materials Corporation, an indirect subsidiary of GAF, formed a new corporation as a wholly-owned subsidiary, which came to be known as BMCA. In accordance with a "Reorganization Agreement" dated "as of" January 31, 1994, GAF Building Materials Corporation transferred substantially all of its roofing business to BMCA. Pursuant to the Reorganization Agreement, BMCA assumed liability for "the first $204 million of Asbestos Liabilities payable relating to claims for bodily injury pending as of the date hereof, or settled prior to the date hereof, whether for indemnity or defense, after giving effect to any insurance or other third party recoveries available to GAF." According to the Committee, GAF and GAF Building Materials Corporation purportedly agreed to indemnify BMCA, jointly and severally, from any asbestos liability over and above its assumed $204 million obligation.

The parties differ as to their characterization of the Pushdown transaction. As alleged by the Committee, the Pushdown was intended to ensure that asbestos claimants and others could not enforce their tort claims against the assets and business transferred to BMCA, except to the extent of BMCA's limited express assumption of liability. By contrast, G-I Holdings and BMCA submit that the rationale for forming BMCA to purchase the GAF roofing business was to afford the roofing business better access to capital markets. G-I Holdings and BMCA contend that this business decision succeeded because today BMCA is the country's leading manufacturer of premium residential and commercial roofing products. Specifically, and according to G-I Holdings and BMCA, since 2000 BMCA's operating income has increased by approximately $52 million, sales have gone from $1.2 billion to approximately $1.4 billion and

EBITDA[13] has also increased by $58 million.  Consequently, G-I Holdings and BMCA maintain that this

business restructuring has created increased value for the G-I Holdings' asbestos creditors.

**B.      The "Securitization" Transaction**

In December of 2000, BMCA engaged in two financial transactions by which the Company

encumbered all the assets of its roofing business through a first lien in favor of the BNY Banks[14] and a

second lien on those same assets in favor of the Noteholders.  With respect to the first lien, in 1999 the

BNY Banks provided BMCA with an unsecured revolving credit facility of $110 million, with a maturity

date of August, 2002.  In exchange for granting a first lien on the assets of the roofing business in favor of

the BNY Banks, the BNY Banks agreed to extend the maturity date of the existing revolving credit facility

to August of 2003, and made available to BMCA a new revolving credit line of up to $100 million.

According to the Committee, "'this first lien not only secured BMCA's obligations under the new facility,

but also bootstrapped into a secured position approximately $100 million in loans and credits that were

already outstanding under the old facility and certain other pre-existing obligations amounting to

approximately $10 million, such that the total secured claims of the BNY Banks . . . came to $220 million.'"

*G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 626

(Bankr. D.N.J. 2004).

In December of 2000, BMCA granted a second lien on the assets of its roofing business in favor

of the Noteholders in purported exchange for the Noteholders' consent to granting the first lien in favor of

---

[13]"EBITDA" is an accounting term of art and abbreviation for "earnings before interest, taxes, depreciation, and amortization."

[14]The BNY Banks include BNY, Fleet National Bank, Bank of Nova Scotia, Chase Manhattan Bank, and Bear Stearns Corporate Lending, Inc.

the BNY Banks.   At the time of this transaction, the Noteholders held approximately $540 million in

outstanding notes that BMCA had issued to public markets over the course of several years.   The

Noteholders apparently did not advance any additional funds or funding commitment to BMCA in

connection with the granting of the second lien.

    As with the Pushdown transaction, the parties disagree on the characterization of the Securitization

transaction.  The Committee argues the Securitization transaction "was a further step in a direction that had

been set by the Pushdown in 1994"; that is, to "structurally subordinate" the claims of the asbestos

claimants "to the claims of the BNY Banks and Noteholders through the granting of liens . . . ."  313 B.R.

at 627.  By contrast, G-I Holdings and BMCA assert that the Securitization transaction was precipitated

by a need to preserve BMCA's "liquidity strength" in the event "something happened to G-I Holdings."

*Id.*

    Based on its characterizations of the Pushdown and Securitization transactions as a scheme to

subordinate the rights of asbestos claimants, the Committee's concern was that if the security interests taken

by BNY and the Noteholders remained unchallenged and undisturbed, these creditors will recover in full

while the asbestos claimants will receive little, if any, distribution from the G-I Holdings bankruptcy estate.

To the contrary, however, the Committee maintained that if the assets of BMCA are divested of the liens

and become part of the G-I Holdings bankruptcy estate, then BMCA's financial creditors will be on equal

footing with the unsecured asbestos claimants for purposes of future distributions.

### C.    The June 8, 2004 Opinion

    In *G-I Holdings, Inc. v . Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R.

612 (Bankr. D.N.J. 2004), the Court declined to grant the complete relief sought by the Committee in

proposing the adversary proceeding.   The Court granted the Committee leave to file an adversary

proceeding challenging the 1994 Pushdown transaction on behalf of G-I Holdings by asserting a fraudulent

conveyance claim premised on actual fraud pursuant to § 544(b) of the Code and N.J.S.A. 25:2-25a

against BMCA, BNY, and the Noteholders.  *Id.* at 648.   The Court permitted the proposed avoidance

action challenging the Pushdown transaction to include a claim for recovery against BMCA as the initial

transferee under § 550(a)(1) of the Code, and against BNY and the Noteholders as mediate or immediate

transferees under § 550(a)(2) of the Bankruptcy Code.  *Id.* at 658-59.   The Court specified, however, that

in the adversary complaint the Committee "specifically identify at least one claimant that did not become

aware of any asbestos-related injury until one year prior to the date on which G-I Holdings filed for

bankruptcy."  *Id.* at 648.   The Court further allowed the Committee to file claims "based on both actual

and constructive fraud on behalf of G-I Holdings under § 544(b) of the Code and N.J.S.A. 25:25a,

N.J.S.A. 25:2-25b, and N.J.S.A. 25:27a against BMCA, BNY, and the Noteholders utilizing the standing

of the New Jersey Department of Environmental Protection as an unsecured creditor of G-I Holdings."

*Id.* at 648-49.[15]

Significant to the present motion to dismiss, in bringing an action to challenge the 1994 Pushdown

transaction as a fraudulent transfer, the Court permitted the Committee to include a claim for recovery

against BNY and the Noteholders as mediate or immediate transferees pursuant to § 550(a)(2) of the

Bankruptcy Code.  *Id.* at 645.   This form of relief, however, was not without qualification.   The Court

---

[15]The New Jersey Department of Environmental Protection was particularly identified because
New Jersey state law affords the Department of Environmental Protection a ten-year statute of
limitations period for asserting fraudulent transfer actions.

noted that "[i]n order to recover from BNY or the Noteholders as mediate or immediate transferees, the

Committee has the burden of proving that BNY or the Noteholders, or both, did not take the transfer for

value and in good faith, and that they had knowledge of the voidability of the transfer." *Id.*[16] Moreover,

the Court stated that "§ 550(a)(2) will permit the Committee to pursue the subsequent transferees for

avoided transfers 'so long as the chain of possession can be established.'" *Id.* (quoting *In re Toy King*

*Distribs., Inc.,* 256 B.R. 1, 148 (Bankr. M.D. Fla. 2000)).

    The Court further commented as follows:

> In support of its contention that BNY and the Noteholders are mediate or
> immediate transferees under § 550(a)(2), the Committee filed exhibits
> purporting to demonstrate the similarity of assets between the two
> transactions [the 1994 Pushdown transaction and the 2000 Securitization
> transaction].  In reviewing these exhibits, all that can be discerned are the
> locations of manufacturing plants owned and operated by GAF.  Simply
> put, this does not on this record establish conclusively that the "exact same
> assets" were involved in both transactions.  However, while the Court
> finds persuasive the arguments raised by G-I Holdings, BMCA, and BNY
> that the assets transferred between the two transactions are entirely
> different and the transactions themselves were distinct events, the issue
> before the Court on a motion to dismiss standard is not whether the
> Committee will ultimately prevail, but whether the Committee is entitled to
> offer evidence to support its claims.  At this juncture, the Court cannot
> state that the Committee will be unable to prove definitively whether the
> assets subject to the Securitization transaction were the same or
> sufficiently related to the Pushdown transaction so as to permit recovery
> from BNY or the Noteholders.

> [*Id.* at 645 (internal citations omitted)].

    Contrary to the conclusion reached with respect to the 1994 Pushdown transaction, the Court held

---

[16]As will be discussed below, § 550(b) of the Bankruptcy Code provides mediate or immediate
transferees with a "good faith" defense.  *See* 11 U.S.C. § 550(b) (West 2005).

the Committee failed to satisfy its burden of presenting a colorable claim to challenge the 2000

Securitization transaction at the time because a valid affirmative defense to the proposed action existed;

namely, lack of subject matter jurisdiction. *Id.* at 652 (citation omitted). More particularly, because the

Committee's proposed avoidance action with respect to the Securitization transaction was "premised on

the contingent event of a judicial determination of alter ego status or substantive consolidation, matters

which remain pending in this Court in the Substantive Consolidation Action and in the District Court in the

Successor Liability Action," the Court could not conclude the proposed avoidance action seeking to

challenge the Securitization transaction was of "'sufficient immediacy and reality to justify judicial

resolution.'" *Id.* (citation omitted).[17]  Thus, the Court denied this aspect of the relief requested by the

Committee.

Approximately one month after the June 8, 2004 decision, on July 7, 2004 the Committee filed the

present adversary proceeding styled, "Complaint to Avoid and Recover Fraudulent Transfer." In the

adversary complaint, the Committee asserts derivatively a cause of action premised upon the claims of the

following alleged creditors of G-I Holdings: David Bitter; Eugenia Jourdan, as representative of the heirs

and estate of William Jourdan; and the New Jersey Department of Environmental Protection. (*Complaint*,

¶¶ 138-143). The adversary complaint contains two counts. Count One seeks to avoid the Pushdown

transaction under § 544(b) of the Code based on actual or constructive fraud, or both. (*Complaint*, ¶¶

144-148). In Count Two of the Complaint, the Committee alleges:

---

[17]The Court did note, however, that in the event the Committee proved successful in either the
Successor Liability Action or the Substantive Consolidation Action, the Committee could seek leave
from the Court to file such an adversary proceeding. *Id.* at 653.

150. BMCA is the initial transferee of assets transferred by GAF BMC in the Pushdown.

151. Pursuant to 11 U.S.C. § 550(a)(1), Plaintiff may recover, for the benefit of G-I's Estate, the property transferred in the Pushdown, or the value of such property, from BMCA as the initial transferee.

152. Following the Pushdown, an interest in property that Defendant BMCA had received in the Pushdown was transferred, directly or indirectly, to each of the other Defendants. The subsequent transfers included (i) the conveyance of interests in the Operating Assets to BMMC [Building Materials Manufacturing Corporation], BMIC [Building Materials Investment Corporation], and BMCA Holdings, and (ii) the granting of liens on such assets for the benefit of the BNY Banks and the Noteholders in the Securitization.

153. Each of Defendants BMIC, BMMC, BMCA Holdings, BNY, Chase, Fleet, BNS [Bank of Nova Scotia], Bear Stearns CL, and the Noteholders constitutes a mediate or immediate transferee within the meaning of 11 U.S.C. § 550(a)(2). None of these Defendants took its interest in the transferred property for value, in good faith, and without knowledge of the voidability of the Pushdown within the meaning of 11 U.S.C. § 550(b)(1).

Pursuant to 11 U.S.C. § 550(a)(2), Count Two seeks to recover, for the benefit of the G-I Holdings' bankruptcy estate, "the property transferred, or the value of such property, from the mediate and immediate transferees." (*Complaint*, ¶ 154). On February 11, 2005, the Noteholder Defendants filed the present motion to dismiss.

## III.    Legal Discussion

### A. The Arguments Advanced by the Noteholder Defendants

In support of its motion to dismiss, the Noteholder Defendants initially submit that "the only transferred 'property' the Committee can arguably recover from the BMCA Noteholders is the Lien on BMCA assets granted during the Securitization." (*See Memorandum of Law in Support of Motion to Dismiss Adversary Proceeding as to Noteholder Defendants*, pg. 8) (hereinafter "*Noteholders' Br.*"). Stated differently, the Noteholder Defendants argue that while the Committee may be able to void the lien granted

to them as a result of the Securitization transaction, the Committee cannot recover the value of the lien,

namely, $760 million, under § 550 of the Bankruptcy Code. (*Noteholders' Br.*, pg. 9). The Noteholder

Defendants argue that in circumstances where a party receives a lien but does not hold the property

securing that lien, the Court should limit the relief under section 550 to lien avoidance and not recovery of

the value of the property. In support of this position, the Noteholder Defendants principally rely on the

cases of *Kelley v. General Motors Acceptance Corp. (In re Farmer)*, 209 B.R. 1022 (Bankr. M.D. Ga.

1997); *Kelley v. Chevy Chase Bank (In re Smith)*, 236 B.R. 91 (Bankr. M.D. Ga. 1999); *In re Greater

Southeast Community Hospital Foundation, Inc.*, 237 B.R. 518 (Bankr. D.C. 1999) and *Kepler v

Security Pacific Housing Services (In re McLaughlin)*, 183 B.R. 171 (Bankr. W.D. Wis. 1995).

From this proposition, the Noteholder Defendants' argument continues as follows. Because the lien

granted in the Securitization transaction was pledged to and is held by BNY as the "Collateral Agent" and

not the individual Noteholder Defendants, "none of the Noteholder Group members (nor any BMCA

Noteholder) is a necessary party to this adversary proceeding," citing *Colorado & Southern Railway Co.

v. Blair*, 214 N.Y. 497, 513 (1915); *Jackson v. Tallmadge*, 246 N.Y. 133, 139 (1927); and *Carey v.

Brown*, 92 U.S. 171, 23 L. Ed. 469 (1875) (*Noteholders' Br.*, pg. 11). The Noteholder Defendants

further assert that they are neither "immediate" or "mediate" transferees under 11 U.S.C. § 550(a)(2). In

this regard, the Noteholder Defendants argue that if the Committee is entitled to avoid the Lien, it can

secure such relief from BNY as the Collateral Agent holding the Lien, and that the Noteholder Group

members, and indeed, all BMCA Noteholders, are not necessary parties. The Noteholder Defendants note

that 11 U.S.C. § 550(d) provides that "[a trustee] is entitled to only a single satisfaction under subsection

(a) of this section." As a consequence of this line of reasoning, the Noteholder Defendants aver that their

motion to dismiss should be granted.[18]

Finally, in support of the motion to dismiss, the Noteholder Defendants contend that the lien granted to BNY for the benefit of the Noteholder Group is nothing more than a security interest in BMCA's roofing business assets. They argue that the lien's "value" arises only in the event of a BMCA bankruptcy or other default of its public debt obligations. As a consequence, the Noteholder Defendants contend that there is no current calculable "value" for the Committee to recover under section 550 of the Bankruptcy Code, and that therefore, any claim to recover such "value" is hypothetical and not yet ripe for adjudication, citing general ripeness doctrine principles as enunciated in the cases of *United Public Workers of America v. Mitchell,* 330 U.S. 75, 67 S. Ct. 556, 91 L. Ed. 754 (1947); *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003); and *Pacific Gas & Electric Co. v. Energy Resources Conservation & Development Commission*, 461 U.S. 190, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983). (*See Reply of Certain Noteholder Defendants to the Official Committee of Asbestos Claimants' Memorandum in Opposition to Certain Noteholder Defendants' Motion to Dismiss,* pgs. 5-7) (hereinafter "*Noteholders' Reply*").

### B. The Arguments Advanced by the Committee

In responding to the motion to dismiss, the Committee affirms that the Court:

> . . . designated the Committee as the representative of G-I [Holdings's] estate to file and prosecute this adversary proceeding seeking to avoid and recover the Pushdown and to recover the assets conveyed in the

---

[18]In its Reply Brief, the Noteholder Defendants assert that they are not arguing that its members are "unnecessary" or "improper" parties under Federal Rule of Civil Procedure 19 or 20, but that the Noteholders are "unnecessary" to afford the Committee complete relief here and are "improper in that there is no viable claim to be asserted against them." (*Noteholders' Reply Br.* pg. 9, n.3).

Pushdown or the value thereof from BMCA as an "initial transferee" and from certain of BMCA's affiliates, the BNY Banks and the Noteholders as "mediate" or "immediate" transferees. While the Court denied the Committee's request for leave to file a second set of claims that would have directly challenged the Securitization, it nevertheless permitted the Committee to recover the liens granted in the Securitization, or the value thereof, on the theory that the Securitization constituted a subsequent transfer of interests in property that had first changed hands in the Pushdown. In denying the Committee authority to bring this second set of claims, the Court did not circumscribe the relief available to the Committee under section 550 of the Bankruptcy Code if it is able to prove up the first set of claims.

[(*See Memorandum of Law of the Official Committee of Asbestos Claimants in Opposition to Noteholder Group's Motion to Dismiss*, pgs. 8-9) (hereinafter "*Comm. Br.*")].

Moreover, the Committee states the crux of its opposition to the motion to dismiss as follows:

Here, the Committee has plead a facially valid claim to recover the value of the Lien from the Noteholders. While section 550 leaves it to the Court's discretion to award monetary damages, that discretion should only be exercised after the record has been fully developed, and not on a motion to dismiss. On that fully developed record, the Committee will prove that it is entitled to recover money damages equal to [the] value of the Lien because the obligations secured by the Lien have been satisfied or further alienated by the Noteholders that held the Notes on the date of the Securitization. Through a series of refinancings of which the Court is well aware, BMCA has already repaid approximately $135 million of the Notes that were outstanding on the date that the Lien was granted. In addition, another $150 million of outstanding Notes will become due in July of this year.[19] Because many of the Noteholders have already converted into cash the obligations due to them and the Lien pledged to them as collateral therefore, avoiding the Lien is insufficient to restore the

---

[19]This payment was subsequently made. By Opinion and Order dated July 12, 2005, this Court denied a motion filed by the Committee directing that the $150 million of payments falling due on July 15, 2005 to holders of notes issued by BMCA on July 17, 1998 be made in escrow pending further order of the Court. *See Official Comm. of Asbestos Claimants of G-I Holdings, Inc. v. Bldg. Materials Corp. of Am. (In re G-I Holdings, Inc.)*, 327 B.R. 730 (Bankr. D.N.J. 2005).

G-I [Holdings] estate to the condition it would have been in had the
Pushdown and the Securitization not occurred. Simply avoiding the lien
will not restore any value to the estate with respect to Noteholders that
have "cashed out" their positions in the Notes. Neither will it impose upon
those Noteholders "a loss of the benefit of the transfer." Thus, in order
to restore the estate to the position it would have been in had the transfer
not been made, it will be necessary and appropriate if the Committee
succeeds on the merits for the Court [to] order [the] recovery of the *value*
of the Lien from the Noteholders by a monetary award.

[(*Comm. Br.*, pg. 16) (emphasis in original)].

In response to the legal arguments put forth by the Noteholder Defendants, the Committee takes
issue with the narrow interpretation of the *In re Farmer* decision urged by the Noteholder Defendants,
which would seek to limit the Committee's recovery in the matter *sub judice* to lien avoidance. In this
manner, the Committee cites *In re Farmer* for the general proposition that when a lien is set aside as an
avoidable transfer, the estate may *either* recover the lien *or* a monetary award equal to the value of the lien.
The Committee argues that while the *Farmer* decision held that the trustee in that case was only entitled
to recovery of the avoided lien, it recognized that section 550 granted it *discretion* to award the estate
recovery of the avoided lien *or the value thereof.* [*Comm. Br.,* pg 15*)* (emphasis added)].

The Committee emphasizes the general rationale that the underlying purpose of section 550(a)(2)
is "to restore the financial condition of the estate to the state in which it would have been had the transfer
not occurred," relying on the cases of *Tidwell v. Chrysler Credit Corp. (In re Blackburn),* 90 B.R. 569,
573 (Bankr. M.D. Ga. 1987) and *Aero-Fastener v. Sierracin Corp. (In re Aero-Fastener),* 177 B.R.
120, 139 (Bankr. D. Mass. 1994). Since ultimately, the *In re Farmer* court's decision to limit the estate's
award to recovery of the lien, rather than awarding the value of the lien, was based on the fact that lien
avoidance would restore the estate to the position that it would have been in had the transfer not occurred,

the Committee argues that the case is factually distinguishable.[20]    In the matter before the Court, the

Committee argues that it seeks to recover the value of the lien from the Noteholders Defendants upon a

fully developed record, which will allegedly demonstrate that the obligations secured by the lien have been

satisfied or further alienated by those Noteholders that held the Notes on the date of the Securitization.[21]

Moreover, the Committee strenuously contends that nothing in this Court's June 8, 2004 Opinion

restricts the Committee's ability to assert all claims available to it under section 550.  Therefore, because

the Adversary Complaint seeks to recover the lien transferred in the Securitization or the value thereof, the

Committee contends that it is within its rights pursuant to Federal Rule of Bankruptcy Procedure 7020,

which incorporates by reference and Federal Rule of Civil Procedure 20[22], to join the Noteholders as

---

[20]*In re Farmer*, the court stated: "[t]he option to make a cash award is one which will be employed in limited circumstances and only where the voiding of the lien is inadequate or unavailable as a remedy.", 209 at 1025.

[21] The Committee further distinguishes the additional cases relied upon by the Noteholder Defendants; namely *Kepler v. Security Pacific Housing Services (In re McLaughlin)*, 183 B.R. 171 (W.D. Wis. 1995) and *Kelley v. Chevy Chase Bank (In re Smith)*, 236 B.R. 91 (Bankr. M.D. Ga. 1999).  In the former decision, the Committee points out that the Court, in rejecting the trustee's request for recovery of money damages, also recognized that section 550(a) allows for the recovery of the value of a lien, and that the decision to award a return of the property transferred or its value is at the discretion of the bankruptcy court.  With regard to the latter decision, the Committee argues that nothing in *In re Smith* obviates the Court's discretion to award the estate the value of the lien after trial on the merits. (*Comm. Br.*, pgs. 16-17).

[22]Federal Rule of Civil Procedure 20  provides in relevant part:
  Rule 20 Permissive Joinder of Parties.
     (a) Permissive Joinder.  ". . . All persons . . . may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all

Defendants in this adversary proceeding, and that therefore the motion to dismiss must be denied.

### C. The Standard on a Motion to Dismiss

A motion to dismiss a complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), made applicable to this Court by operation of Federal Rule of Bankruptcy Procedure 7012, is viewed with disfavor by federal courts and should be granted sparingly and with caution, and only in instances where it appears to a certainty that no set of facts could be proven at trial which would entitle the plaintiff to any relief. *Kremhelmer v. Powers*, 633 F. Supp. 1145, 1147 (E.D. Mich. 1986) (citation omitted). When considering a motion to dismiss, a court must accept as true the allegations and facts pleaded in the complaint and any and all reasonable inferences derived from those facts. *Renz v. Schreiber*, 832 F. Supp. 766, 770 (D.N.J. 1993) (citing *Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1400 (3d Cir.1991)). A complaint should not be dismissed for failure to state a claim "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief.'" *Jordan v. N.J. Dep't of Corr.*, 881 F. Supp. 947, 950 (D.N.J. 1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974)). However, a motion to dismiss may be granted only if, after accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, the plaintiff is still not entitled to any relief. *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183 (3d Cir. 2000),

---

defendants will arise in the action. A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities." Fed. R. Civ. P. 20 (West 2005).

*cert. denied*, 532 U.S. 1038, 121 S. Ct. 2000, 149 L. Ed. 2d 1003 (2001).

Further, in ascertaining whether a plaintiff has stated a cognizable claim, the court also examines the facts as alleged by the plaintiff for any dispositive affirmative defenses. *Griesenbeck v Am. Tobacco Co.*, 897 F. Supp. 815, 820 (D.N.J. 1995). A complaint may be subject to dismissal for the failure to state a legally cognizable claim when an affirmative defense appears on its face. *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994). Although a motion to dismiss normally invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense. *Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996) (citation omitted); *see generally* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (2d Ed. 1990)("A complaint showing that the statute of limitations has run on the claim is the most common situation in which the affirmative defense appears on the face of the pleading," rendering dismissal appropriate). Finally, in the bankruptcy context, if the claim lacks "any merit whatsoever, allowing another party to pursue the claims at the expense of the bankruptcy estate would neither be in the best interest of the estate nor necessary and beneficial to the efficient resolution of the bankruptcy proceeding." *In re iPCS, Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003).

**D. The Court's Interpretation of 11 U.S.C. Section 550**

As previously indicated, the Noteholder Defendants' motion to dismiss hinges upon this Court's interpretation of § 550 of the Bankruptcy Code. Section 550(a) of the Code provides as follows:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate,

the property transferred, or, if the court so orders, the value of such property, from –

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

> (2) any immediate or mediate transferee of such initial transferee.

[11 U.S.C. § 550(a) (West 2005)].

In turn, § 550(b) of the Bankruptcy Code provides:

> (b) The trustee may not recover under subsection (a)(2) of this section from –

> > (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
> > (2) any immediate or mediate good faith transferee of such transferee.

[11 U.S.C. § 550(b) (West 2005)].

Section 550(a) of the Code authorizes a trustee or debtor-in-possession, after avoidance of a transfer under one or more of the avoiding powers, to recover the property transferred or the value of the property transferred. 11 U.S.C. § 550(a) (West 2005). The property or its value may be recovered from the initial transferee or a subsequent transferee, although § 550(b) of the Code prevents recovery from a good faith subsequent transferee. *Collier on Bankruptcy* ¶ 550.02 (15th ed. rev. 2003). Pursuant to § 550(d) the trustee or debtor-in-possession is entitled to only a single satisfaction under § 550(a). Section 550(a) is intended to "restore the estate to the financial condition it would have enjoyed if the transfer had not occurred." *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998) (citations omitted). However, "since the Bankruptcy Code does not provide guidance on when the

court should order payment of the value of [the] property rather than order the return of [the] property itself, it is within the court's discretion to make such a determination." *Id.* at 176-77 (citing *Aero-Fastener, Inc. v. Sierracin Corp. (In re Aero-Fastener, Inc.)*, 177 B.R. 120, 139 (Bankr. D. Mass. 1994)). Courts have utilized this discretion by employing divergent methods.

Some courts have held that § 550(a) of the Code "gives a preference to the return of property unless it would be inequitable to do so." *Morris v. Kansas Drywall Supply Co. (In re Classic Drywall, Inc.)*, 127 B.R. 874, 876 (D. Kan. 1991) (citing *Gen. Indus., Inc. v. Shea (In re Gen. Indus., Inc.)*, 79 B.R. 124, 135 (Bankr. D. Mass. 1987)). As articulated by the court in *In re Classic Drywall, Inc.*, "[t]his approach finds some support in the language of § 550(a) and the history behind it. Section 60(b) of the Bankruptcy Act allowed the recovery of value only when the property had been converted. While this limitation is gone, § 550(a) lists first the recovery of property and then permits the recovery of value only upon the order of the court." 127 B.R. at 877. However, "other courts have simply read § 550(a) as placing in the court's discretion the choice between return of the property and an award of its value." *Id.* (citing *In re First Software Corp.*, 107 B.R. 417, 423 (D. Mass. 1989)).

Despite these two general approaches, there are some common circumstances in which the courts have chosen one remedy over the other. "When the record is devoid of evidence on the property's market value, courts have ordered the property to be returned." *Id.* (citing *Widemire v. Siddihi Bros., (In re King Arthur Clock Co.)*, 105 B.R. 669, 672 (Bankr. S.D. Ala. 1989)). "When conflicting evidence exists on the value of the transferred property, judicial economy has been promoted by not deciding value in favor of returning the property." *Id.* (citing *In re Gen. Indus., Inc.*, 79 B.R. 124, 135 (Bankr. D. Mass. 1987)). On the other hand, "[w]here the property is unrecoverable or its value diminished by conversion or

depreciation, courts will permit the recovery of value." *Id.* (citing *In re First Software Corp.*, 107 B.R. at 423). Another circumstance "for awarding the value [of the property] is when the value is readily determinable and a monetary award would work a savings for the estate." *Id.* (citing *Gennrich v. Montana Sport U.S.A., Ltd. (In re Int'l Ski Serv., Inc.)*, 119 B.R. 654, 659 (Bankr. W.D. Wis. 1990)). The Bankruptcy Court for the District of Massachusetts summarized as follows: "The factors which the court should consider in determining whether to order [the] turnover of the property rather than payment of the value include whether the value of the property (1) is contested; (2) is not readily determinable; or (3) is not diminished by conversion or depreciation. Conversely, courts will generally permit the recovery of value if the value is readily determinable and a monetary award would work a savings to the estate." *In re Aero-Fastener, Inc.*, 177 B.R. at 139. *See* <u>*also*</u> *Drewes v. FM Da-Sota Elevator Co. (In re Da-Sota Elevator Co.),* 939 F. 2d 654, 655 n.2 (8th Cir. 1991) (noting that a court will not order the recovery of a wasting asset pursuant to § 550(a); *In re First Software Corp.*, 107 B.R. at 423-24 (noting that "when a debtor cannot be made whole by the return of property lost through an avoidable transfer because of depreciation in value of the property, the court may enter an award if money judgment equal to the property's value as of the date of the petition").

### E. Application of Motion to Dismiss Standard to the Committee's Claims

With respect to the present motion to dismiss brought by the Noteholder Defendants, the limited issue before the Court is whether, after accepting all of the allegations plead by the Committee as true, the complaint fails to state a claim upon which relief can be granted pursuant to Federal Rule of Bankruptcy Procedure 7012, which incorporates by reference Federal Rule of Civil Procedure 12(b)(6).

With the Court's June 8, 2004 Opinion having granted the Committee leave to file an adversary

proceeding challenging the 1994 Pushdown transaction on behalf of G-1 Holdings asserting a fraudulent

conveyance claim against BMCA, BNY and the Noteholders pursuant to section 544(b) of the Code, and

within that context, having specifically granted authority to the Committee to include a claim for recovery

against BMCA as the initial transferee under § 550(a)(1), and against BNY and the Noteholder Defendants

as immediate or mediate transferees under § 550(a)(2), the Court remains steadfast in its conclusion that

the Noteholder Defendants are appropriate parties in this action, and § 550(a)(2) would provide the

Committee relief against the Noteholder Defendants, assuming, of course, the Committee can demonstrate

after discovery that the property transferred in the Pushdown transaction is the same property involved in

the subsequent Securitization transaction, and the Noteholder Defendants do not have a valid defense

pursuant to § 550(b) of the Code.

In interpreting § 550(a) of the Code, this Court finds it within the discretion of the Court to decide

at the appropriate time whether to order the return of the property or order the payment of the value of the

property.  However, at this infant stage of the adversary proceeding, it would be premature to hold that the

only recovery available to the Committee is the recovery of the lien granted for the benefit of the BMCA

Noteholders.  Consequently, accepting as true the allegations and facts plead in the complaint, and any and

all reasonable inferences derived therefrom, the Court finds that the Committee has plead a cognizable claim

as to the Noteholder Defendants pursuant to Count II of the adversary complaint, and that therefore, the

Noteholder Defendants are not entitled to dismissal under the strict standards set forth under Federal Rule

of Bankruptcy Procedure 7012.  Without a complete record before the Court, it cannot be determined

whether the Noteholder Defendants have a valid defense pursuant to § 550(b) of the Code, and equally as

significant, whether the relief of recovering the value of the lien would more appropriately restore the

34

bankruptcy estate to the financial condition it would have enjoyed if the transfer had not occurred, should

the Committee prove ultimately successful in this action.

In considering the arguments in favor of the present motion to dismiss urged by the Noteholder

Defendants, the Court first notes that consistent with its June 8, 2004 Opinion, § 550 of the Bankruptcy

Code provides that once an avoidable transfer is set aside, the estate may recover, in the discretion of the

Court, either the property conveyed or the value thereof, in the form of a monetary equivalent to the value

of the lien from the "immediate and mediate transferees," in this case BNY and the Noteholder Defendants,

and that the remedy available to the Committee is not as a matter of law, limited to the avoidance of the lien.

In so finding, this Court recognizes that to conclude otherwise would run contrary to the weight of authority

including cases cited earlier herein, which prescribe that pursuant to § 550, the trustee or debtor in

possession may recover either the property, or with court approval, the value of the property from the initial

transferee, a party for whose benefit the transfer was made or the immediate or mediate transferee of the

initial transfer. *Collier on Bankruptcy* ¶ 550.02 (15th ed. rev. 2003.).

Having so found, the Court is also mindful that § 550(b) of the Bankruptcy Code fully protects

transferees subsequent to the initial transferee (and, in turn, their transferees) that have taken for value, in

good faith and without knowledge of the voidability of the transfer. *Id.* In this regard, as recognized by the

Court in its June 8, 2004 Opinion:

> As the legislative history to section 550 clarifies, section 550 "'prescribes
> the liability of a transferee of an avoided transfer, and enunciates the
> separation between the concepts of avoiding a transfer and recovering from
> the transferee.'" *In re Toy King Distribs., Inc.*, 256 B.R. 1, 143 (Bankr.
> M.D. Fla. 2000) (citations omitted). The structure of section 550(a)
> "separates initial transferees and beneficiaries, on the one hand, from
> immediate or mediate transferees, on the other.'" *Id.* (quoting *Bonded Fin.*

> *Servs., Inc. v. European Am. Bank*. 838 F.2d 890, 895 (7th Cir. 1988)).
> While the liability of the initial transferee under section 550 is "strict,"
> immediate or mediate transferees, however are afforded a "good faith"
> defense under section 550(b) of the Code. *Id. In order to recover from
> BNY or the Noteholders as mediate or immediate transferees, the
> Committee has the burden of proving that BNY or the Noteholders, or
> both, did not take the transfer for value and in good faith, and that
> they had knowledge of the avoidability of the transfer. See* 11 U.S.C.
> § 550(b)(1) (West 2004); *Belford v. Breck* (*In re Med. Cost Mgmt.,
> Inc.*), 115 B.R. 406, 409 (Bankr. D. Conn. 1990). *Further, section
> 550(a)(2) will permit the Committee to pursue the subsequent
> transferees for avoided transfers "so long as the chain of possession
> can be established." In re Toy King Distribs., Inc.*, 256 B.R. at 148
> (citation omitted).

> [313 B. R. at 645. (emphases added)].

Therefore, upon a complete record exchanged by the parties through the course of discovery,

BNY and the Noteholder Defendants will be able to assert the full panoply of applicable defenses with

respect to the Committee's section 550(a) claim.

With respect to the issue of valuation *vis-a-vis* the Noteholder Defendants, the Court finds in favor

of the Committee that since the adversary complaint properly asserts a facially valid claim to recover the lien

transferred in the Securitization or the value thereof pursuant to § 550(a), as authorized by this Court's June

8, 2004 Opinion, the Committee is well within its rights to join the Noteholders as Defendants pursuant to

Federal Rule of Civil Procedure 20 and Federal Rule of Bankruptcy Procedure 7020 by virtue of their

position as alleged immediate or mediate transferees under the Bankruptcy Code. Again, with respect to

this finding, the Court reiterates that the same critical caveats apply concerning the availability of good faith

defenses under section 550(b) and the burden upon the Committee of proving "chain of possession"

pursuant to section 550(a)(2). Discovery might demonstrate that the Committee cannot satisfy its burden

in this regard.  That is,  the Court continues to note, as it did in its June 8, 2004 Opinion, the arguments

raised by G-1 Holdings, BMCA, and BNY that the assets transferred between the Pushdown transaction

and the subsequent Securitization transaction are entirely different and that the transactions themselves were

distinct events.  If so, the Committee's claim against the Noteholder Defendants under § 550 of the

Bankruptcy Code would most likely fail.  At this juncture, however, the Court recognizes that the only issue

before the Court at this time is whether the Committee is entitled to offer evidence to support its claims, and

not whether the Committee will ultimately prevail with respect to those claims after a complete discovery

record.

For this reason, presently, the Court cannot state with certainty that the Committee will be unable

to prove whether the assets subject to the Securitization transaction were the same or sufficiently related to

the Pushdown transaction so as to permit recovery from BNY or the Noteholder Defendants.  Therefore,

consistent with its June 8, 2004 Opinion, the Committee may sustain a claim for recovery against BNY and

the Noteholder Defendants as immediate or mediate transferees under § 550(a)(2) of the Code, pending

a complete discovery record and, if necessary, a trial on the merits.

With respect to the lack of ripeness allegation raised by the Noteholder Defendants in the reply to

the Committee's memorandum in opposition to the motion to dismiss, the Noteholder Defendants argue that

the existence of the lien has not changed the payments that BMCA has made on the Notes and that therefore

there is no current calculable "value" for the Committee to recover under section 550 of the Code.  More

particularly, the Noteholder Defendants argue that BMCA's payments under the Notes arise solely out of

BMCA's obligations under the terms of the Notes and its public indentures, that these payments have been,

and must be, made irrespective of the lien, that this Court in its June 8, 2004 Opinion rejected the

37

Committee's request to assert claims to recover "subsequent payments" to the BMCA Noteholders as

voidable and recoverable transfers, so that the Committee's request seeking recovery for a "value of the

lien" remains hypothetical unless BMCA defaults on its indentures or enters bankruptcy. (*See Noteholders'*

*Reply Br.* pg. 7).

The Court reiterates and incorporates by reference herein the case law and principles cited in its

June 8, 2004 Opinion, which conclude that with respect to assertion of the ripeness doctrine, the ultimate

question in each case "is whether the facts alleged show that there is a substantial controversy, between

parties having adverse legal interests of sufficient immediacy and reality to justify judicial resolution." 313

B.R. at 652. (citing *Peachlum v. City of York*, 333 F.3d 429, 434 (3d Cir. 2003)). Where a plaintiff's

action is based on a contingency, as with respect to the initial challenge to the Securitization transaction

sought by the Committee and denied by the Court, which was premised on the contingent event of a judicial

determination of alter ego status or substantive consolidation, matters which remain pending in this Court

in the Substantive Consolidation Action and in the District Court in the Successor Liability Action, it is

unlikely that the parties' interests will be "sufficiently adverse to give rise to a case or controversy within the

meaning of Article III." *Id.*  (citing *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 411-12 (3d

Cir. 1992)).

In this instance, the Court finds no such contingency exists.  That is, the Court can conclude that as

a function of the 1994 Pushdown transaction the proposed section 550(a)(1) and (a)(2) claims are of

"sufficient immediacy and reality to justify judicial resolution."  Moreover, issues with respect to potential

remedies of lien avoidance or valuation of the lien under section 550(a)(2), including questions of readily

determinable "value" as a measurement of potential recovery by the Committee absent default by BMCA

on the Notes securing the lien, are matters left to the discretion of the Court in fashioning an appropriate

remedy under § 550 of the Code should the Committee prove ultimately successful. Significantly, the Court

will reach this determination only if and when the Committee is able to prevail on its complaint seeking

recovery from immediate and mediate transferees upon a fully developed record and after consideration of

all relevant defenses.

Contrary to the assertions of the Noteholder Defendants, the Court finds that potential alleged

complexities discerning "value" as to any lien purportedly to be avoided do not operate as a threshold barrier

to defeat the ability of the Committee to bring section its § 550(a)(2) claims after having been authorized by

this Court to do so in the June 8, 2004 Opinion. Accordingly, a motion to dismiss premised upon an alleged

"hypothetical" or undefined "value" of the lien must also fail.

## IV.    Conclusion

In summary, this Court finds that the allegations plead by the Committee in Counts I and II of the

complaint pursuant to 11 U.S.C. §§ 544(b) and 550, respectively, are consistent with those authorized by

this Court in its Opinion dated June 8, 2004. The Court finds the claims cognizable and sufficient to defeat

the Noteholder Defendants' present motion to dismiss pursuant to the stringent standards set forth in Federal

Rule of Bankruptcy Procedure 7012, which incorporates Federal Rule of Civil Procedure 12(b)(6).

Further, upon careful consideration, this Court finds that given that the underlying purpose of Bankruptcy

Code § 550(a)(2) is to restore the financial condition of the estate to the state in which it would have been

had the transfer not occurred, should the initial transfer to BMCA be avoided pursuant to § 544(b), the

Committee may avoid the lien, or if the Court so orders in its discretion, recover the value thereof from

immediate or mediate transferees under § 550(a) after the creation of a fully developed factual record, and

39

with full consideration of the protections afforded such transferees pursuant to Bankruptcy Code § 550(b). While the Committee will be permitted to continue to prosecute its adversary proceeding against the Noteholder Defendants and BNY at this time, the completed discovery record may demonstrate that many of the arguments advanced by the Noteholder Defendants and BNY might be ripe for summary disposition. As previously stated, however, at this juncture the Noteholder Defendants' motion to dismiss for failure to state a claim upon which relief may be granted must be denied.

An Order shall be submitted in accordance with this Opinion.

Dated: January 19, 2006

ROSEMARY GAMBARDELLA
UNITED STATES BANKRUPTCY JUDGE